[No. 8194.   Department Two.   December 10, 1909.]

*In re Application of* MAUDE FIELDS *for a Writ of Habeas Corpus.*

MAUDE FIELDS, *Appellant*, v. ARTHUR W. DEMING *et al., Respondents.*[1]

ADOPTION—ABANDONED CHILD—GOOD FAITH — EVIDENCE — COMPETENCY.   Evidence of an attempted adoption of a child by a foundling hospital is competent to show the intention and good faith of foster parents receiving the child from the hospital and adopting it.

ADOPTION—ABANDONED CHILD—EVIDENCE—SUFFICIENCY.   Evidence of a founder of a foundling hospital and of the superintendent, that a child brought there by the mother was abandoned and a written release signed, is sufficient, although contradicted, to sustain findings that the child was abandoned by the mother.

SAME—ABANDONMENT—EVIDENCE—SUFFICIENCY.   An abandonment of a child is shown where *habeas corpus* proceedings by the mother to secure possession of the child were voluntarily dismissed in 1898, and the child was left in the possession of adoptive parents for ten years.

PARENT AND CHILD—RIGHT TO CUSTODY—ADOPTION.   In deciding the right to a child as between a mother who had abandoned it, and adoptive parents, the pecuniary standing of the parties is not to be considered; but the welfare of the child is of grave importance and may be made controlling.

SAME—EVIDENCE—SUFFICIENCY.   A mother is not entitled to the custody of her boy, and the same should be left in the custody of foster parents, where it appears that the child was illegitimate and had been abandoned in infancy to a foundling hospital and a release signed; that *habeas corpus* proceedings by the mother to secure possession were abandoned by her, and nothing done for ten years,

[1]Reported in 105 Pac. 466.

during which time the child had been brought up by foster parents and an attachment and environment created distinctly different from what would be the case in a change of guardianship, and the mother was unable to give him as good a home or attention as he now had.

Appeal from a judgment of the superior court for Whatcom county, Neterer, J., entered December 28, 1908, upon findings in favor of the defendants, dismissing habeas corpus proceedings, after a trial on the merits. Affirmed.

*Craven & Greene*, for appellant.

*Hadley, Hadley & Abbott*, for respondents.

DUNBAR, J.—This action is brought by appellant, Maude Fields, to recover the possession of the body and person of her son, William Barnes Fields, a minor, who was, at the time of the trial, of the age of thirteen years, and who is now residing with and under the control of Arthur W. Deming and Lulu M. Deming, his wife, respondents herein.

The appellant was an orphan at the age of fourteen years, striving to earn her own living, and when fifteen years of age met one William Barnes who, under promise of marriage, accomplished her downfall, and thereafter refused to carry out his promise of marriage. On the 10th day of September, 1895, the appellant gave birth to the child, William Barnes Fields, at the Female Hospital in the city of St. Louis. She remained in the hospital until about the 26th day of September, 1895, when she sought and obtained employment as a wet nurse at a compensation of $30 a month, and she placed her own child in the care of third persons, first paying $12 a month and later $15 a month for a wet nurse for her child. According to her testimony, the child did not seem to thrive under the care he was receiving, and she concluded, under the advice of others that it was best to take him to the hospital for treatment, and on the 8th day of June, 1896, she did take the child to a place that she says she was informed was a child hospital, and was known as the Bethesda, and that at this time she was weak and ill. She was accom-

panied to the hospital by a negress who had been employed
by her as a wet nurse for the child.

At this point the real controversy commences, the appel-
lant testifying, in substance, that she did not intend to do
more than to leave the child at the hospital for a short time
until she should be able to take care of it herself; that in
about three weeks from the time she left it, she went to see the
child, and was informed that it had been placed in a family,
and that it was against the rules of the hospital to inform the
mother of the destination of the child; that it appeared that
this was a foundling hospital where babies were received for
the purpose of finding them good homes, but that she did not
know when she took the child there that it was a foundling
hospital, and did not wish to, and did not, abandon the child
or authorize the hospital to do anything but exercise tem-
porary care over the child; that when she found the child
was gone, she was prostrated with grief which was followed
by illness, and that as soon as she was able to do so she em-
ployed a detective, one Arthur Welt, to find the child.

To condense the recital, the child was located in the home
of the respondents, and a writ of habeas corpus was sued out
in a competent court in the city of St. Louis, Missouri, in
July, 1898. The respondent answered the writ, bringing
the child into court. The cause was continued a few days,
and when it was called for trial again it was dismissed
without prejudice on motion of petitioner's counsel, for the
reason, according to her statement, that she was not able to
attend court and was then in the country some distance from
St. Louis. The appellant undertakes to make some point on
the alleged fact that she did not authorize the dismissal of
the case, but only its continuance, but she herself testifies
that she wrote to the detective, who seems to have had the
matter in charge, to continue the case indefinitely, which
amounts to about the same thing as, of course, the case could
not be continued indefinitely. She remained in the country
without any further correspondence on the subject until the

last of October or first of November, when she returned to the city. No further attention was paid to the matter, and it does not appear that there was any further correspondence about it until her return to the city some months afterwards, when she was informed that the case had been dismissed. Appellant testified that she again took up the search through the same detective, but was never able to locate the respondents until she heard of them in the year 1905, when she was informed that they lived in the city of Bellingham, Washington, and that as soon as she was able to earn the means necessary for the prosecution of the suit, she commenced the same in the month of June, 1908. The testimony concerning the attempt to locate the respondents was the testimony of the appellant as to what was told her by detective Welt, he not having been called as a witness in the case.

The respondents introduced Mrs. Roger Haynes, the founder and directrix of the Bethesda hospital, the home where the baby was left. She testified that she knew of the circumstances under which the baby was left at the home, and that the child was a deserted child, abandoned by its mother, who at the time she brought it there signed papers of abandonment; that it was neglected, dirty, and sickly. The testimony of this witness was also largely hearsay, being a recital of what was told her by the superintendent and other employees of the place, but she remembered the child, its name, and its installation in the hospital, testifying that it remained in the hospital about a year, and that during that time its mother never came to see it and never was heard of until after the child had been taken and adopted by the respondents in this case. She was, however, unable to produce the relinquishment which she said the mother made, her testimony being to the effect that she had searched in the records for it, her explanation of its loss being that the hospital was in a torn up and disorderly condition just at that time by reason of the building having been seriously damaged by a cyclone a day or two before that, and that just at that

time they were moving into temporary quarters, and she thought it might have been lost in the confusion attending the moving.

Mrs. C. S. Nelson, who as Miss Schoenher was superintendent of the Bethesda foundling home at the time the baby was left there, testified that they were then in temporary quarters following the unroofing of their building by the tornado; that she distinctly remembered the baby William Barnes; that it was brought to the hospital on the 8th day of June, 1896, by its mother and a negress; that she met them at the door and that the mother said she had come to give the baby up if they would take it; that she informed the mother that the institution was a home for deserted babies, but that it also took in mothers with their babies if they chose to come, until such time as a home could be found for the babies; that appellant informed her that she did not wish to come; that she said she was willing to sign a paper to give the baby up; that she did sign such paper after having it read to her, and after having the form of relinquishment handed to her for her investigation; that the paper was signed and witnessed, and that she then delivered the paper to Mrs. Haynes, the directrix, who was the custodian of such papers; that the name of the child filled into the blank was William Barnes. She further testified that she had a vivid recollection of the circumstances by reason of the unfeeling acts of the mother, her language being: "She showed no feeling whatever. She did not touch the child nor kiss it good bye; so much so that I doubted in my own mind whether it was her own child." She testified that she remained at the home until the next January, and that the mother did not call to inquire for the child in three weeks, or at all during her stay there, and that she would have known it had she called. There was a great deal of other testimony on this point which it is impracticable to review, but what we have set forth is in substance the testimony adduced.

In answer to the testimony of the appellant that after the

dismissal of the cause in the city of St. Louis, she had attempted to locate the Demings, respondent Arthur Deming testified that he was served with the writ before mentioned at his place of business at the store of Meyer, Bannerman & Co., where he was superintendent for many years; that he continued in that employment until the summer of 1900, when he came to Washington, and that he could have been found there any day during business hours during that time. This testimony was corroborated by the wife of the respondent, by his employer, and by others. The fact seems to be firmly established. The testimony in this case is exceedingly voluminous, the record being very large. The court was liberal in allowing the introduction of testimony, and everything connected with the case or tending to throw light on the actions or motives of these parties was allowed to go into the record.

There seems to be two leading questions in the case. The first is, was the child abandoned by its mother before its adoption by the Demings? It may be stated here that the record shows that the respondents adopted or undertook to adopt this child under the laws of the state of Missouri, and whether or not it was a legal adoption binding on the mother, it is at least competent to show the intention and good faith of the respondents, and is probably binding upon them. The second proposition is, was there an abandonment of the custody of the child after the dismissal of the habeas corpus proceedings in July, 1898?

From a careful investigation of all the testimony in this case, and recognizing the pitiful condition of the mother, that she was grievously sinned against, and that the fault, if fault there was, was caused by inexperience on her part and by villainous wiles on the part of her seducer, we are forced to the conviction that the fact was that the intention of the appellant when she took the child to the hospital was to abandon it, in the sense of relinquishing all claims that she had upon it, so that it might be legally disposed of by the

authorities of the hospital. We are also forced to the conclusion that there was an abandonment after the attempted recovery of the custody of the child in 1898. Ten years is a long time to leave a child in the custody of kind-hearted people who have seen fit to adopt it, when the tendency must be that mutual affection will spring up between the foster parents and the adopted child. The testimony in this case shows that there is a warm attachment and affection existing between the respondents and this child. It is impossible to read the record without concluding that that affection is as warm and abiding as the affection between a natural parent and child. These people have given this child all the advantages that could have been given to a child of their own. Little circumstances are testified to which show conclusively the feeling that existed. The foster father has looked with particular interest after the education of the boy, has helped him with his studies at home, not occasionally but constantly; testifies that he always heard his prayers of nights when his mother was not able to attend to him, and he administered the thousand and one little attentions that are only administered through the promptings of affection; that he was a sickly boy; that they have spent much for him in the way of medical services and attention, and devoted their own personal attention to him most faithfully; that the boy is impulsive, somewhat stubborn in disposition, and at the same time loving and affectionate. Certainly he is just at the age when he needs the restraining hand of a father.

The court found, among other things, that it was to the best interests and welfare of the child that he be and remain in the care and custody, and under the control, of said respondents, and that to transfer his care, custody, and control to the petitioner herein would be detrimental to the interests of said child and detrimental to his welfare. The learned counsel for the appellant complain of this finding and insist that the court based its conclusion in this case altogether upon the welfare of the child, inasmuch as the court

had previously found that the mother was a proper person to have the care and custody of the child. This finding of the court was as follows:

"That the petitioner resides in the said city of St. Louis, state of Missouri, in what has been designated by her as a flat, which she has rented and is now renting, which flat has been by her and is comfortably furnished and equipped for living purposes, and in which said flat rooms are let by her from time to time to female tenants who remain for irregular periods; that the petitioner is a seamstress, engaging principally in sewing and, in pursuing the same, the major portion of her work is done away from her home; that there are no other members of petitioner's family or other relatives residing with her; that petitioner is possessed of sufficient means to clothe, nurture, and educate said child in the schools of the said city of St. Louis, but is not possessed of sufficient means to maintain him in the position and station in life in which he is now being maintained by respondents, and to which he has been hitherto accustomed; that the petitioner is otherwise a suitable and proper person to have the care and custody of said child and is strongly attached to said child, and that said child has never known the petitioner until the institution of this proceeding."

So that the finding that the petitioner was qualified to have the possession of the child was somewhat modified by the facts found. There is no question but that, while the welfare of the child is of grave importance, the rights of the natural parent must also be taken into consideration. But, under the circumstances of this case, the rights of the foster parents must also be considered. And in taking into consideration the welfare of the child, it is not proper to consider the material wealth possessed by either the natural or foster parents, or to make comparisons in that regard, for the tendrils of parental affection entwine around the offspring of the poor with as much strength as they do around the children of the rich; if, indeed, with not greater strength by reason ordinarily of more intimate relationships and sacrifices that have to be made and which tend to strengthen mutual love and

affection.   Nor, looking exclusively at the welfare of the child, can it be said that the financial condition of the parents respectively should be taken into consideration, for it is a matter of common knowledge to all thinking and observing people that the best men and women of our nation, if not of the world, came up through the gateway of industry, self-denial, and self-reliance.   These efforts and sacrifices seem to be necessary to the moulding and rounding out of perfect individuals.   At the same time, it must be apparent that, where a child has been brought up by foster parents in an environment that is distinctly different from the environment to which he would be submitted by a change of guardianship, a revulsion of feeling would be liable to occur which would lead to embarrassments and misery.   In this case, looking at the question strictly from the standpoint of the boy's welfare, the mother would not be able to give him the attention which at this age he sadly stands in need of.   She would not be able to give him a name, for he has none; and if he were uprooted from the home and affection which now warm and protect him, and transplanted to the environment described by the mother as her home, the probabilities are that it would result in discontent and misery to both mother and son.

There are many other questions that were raised in the trial of the case which we do not deem it necessary or best to discuss, but for the reasons assigned we think the court acted wisely in reaching the conclusion that it did, and the judgment will therefore be affirmed.

RUDKIN, C. J., CROW, MOUNT, and PARKER, JJ., concur.