[Nos. 31347, 31351. Department One. February 1, 1951.]

THE STATE OF WASHINGTON, *on the Relation of Bess E. Gilroy, Plaintiff*, v. THE SUPERIOR COURT FOR KING COUNTY, *Respondent*.

*In the Matter of the Welfare of* BABY BOY COLE.[1]

[1] Reported in 226 P. (2d) 882.

*Meier & Murray,* for relator and appellant.

*Charles O. Carroll, K. G. Smiles,* and *John W. Croome,* for respondent.

BEALS, J.—During the year 1948, Bess E. Gilroy, appellant and relator herein, was operating a maternity hospital in Seattle pursuant to a license issued by the state department of health.

July 26, 1948, a young unmarried woman, who was pregnant, was admitted to the hospital, where she remained until after the birth of a male child, October 23, 1948, the delivery having been accomplished under proper medical service.

While at the hospital, the mother informed relator that she wished her child to be placed for adoption with a married couple of her acquaintance, residing at Wapato. A few days after the birth of the child, the mother signed (in blank and undated) a "WAIVER AND RELINQUISHMENT AND CONSENT TO ADOPTION" of the baby. The mother's signature was

witnessed by relator. The paper was admitted in evidence as relator's exhibit No. 1.

In due season, the mother's friends visited Seattle, and paid to relator her charge for caring for the mother, medical attention, and care of the child for six weeks, which amounted in all to six hundred dollars. The couple then took the baby home with them, but, in about a month, returned the child to relator, being of the opinion that his physical condition was such that they should not proceed with the adoption.

Upon the advice of a competent physician, relator placed the child in the King county hospital December 15, 1948. Relator attempted to locate the mother at an address that the latter had left with her, but was unable to do so. Late in December, a social worker connected with the King county juvenile court requested relator to sign a petition, to be filed with the court, asking that the baby be declared a dependent child. Relator complied with this suggestion, and her petition was filed with the court December 31, 1948, while the child was in the King county hospital.

During the month of February, 1949, relator returned to the Wapato couple the amount which they had paid to her for care of the mother and child.

February 3, 1949, the King county welfare department placed the child in a foster home for care and possible adoption, the county paying sixty dollars a month for care of the child.

May 18, 1949, notice of a hearing on relator's petition, set for September 7, 1949, was issued by the juvenile court, directed to the baby's mother. The sheriff of King County filed his return of "Not Found," and, thereafter, notice of the hearing was given by publication, as required by law.

September 7, 1949, a hearing was had, a default was entered against the mother, and the matter was continued to September 26th, when it was taken under advisement by the court. A short time thereafter, the court filed its memorandum opinion, stating that relator was *in loco parentis* to the child and was able to pay for its support; that there

was "no social necessity" for the operation of the maternity hospital conducted by relator, such services being rendered by approved agencies supported by the city "Community Chest," and that, for the reasons stated, both law and equity required that relator should pay for the child's support.

December 21, 1949, the court entered an order, based upon the published notice to the mother, (1) permanently terminating all of the mother's maternal rights, (2) making the child a ward of the juvenile court, under the care of the King county welfare department, until further ordered, and (3) directing relator to pay into the registry of the court the sum of sixty dollars a month for care of the child, until further order of the court.

From this order, relator appealed and, a few days later, filed herein, as an alternative to the appeal, an application for a writ of certiorari to review the order. The writ having been granted, this court, on relator's motion, ordered the appeal and the pending certiorari "consolidated for all purposes of appeal."

Appellant (and relator) makes the following assignment of errors:

"(1) The court erred in holding that relator was an 'other person having custody of said child' within the meaning of § 1987-8, Rem. Rev. Stat.

"(2) The court erred in holding that relator stood *in loco parentis* to said child.

"(3) The court erred in directing relator to pay for the care of said child.

"(4) The court erred in entering its judgment of December 21, 1949, directing relator to pay $60.00 per month for the support of said child.

"(5) The court erred in subjecting relator to an inquisition by the court concerning the operations of her hospital in reference to other patients and in reference to matters aside from those directly connected with this case as a basis for holding that there was no social justification for the operation of a maternity hospital by relator and therefore it was equitable that she be required to support the child."

Laws of 1913, chapter 160, § 5, p. 524, Rem. Rev. Stat., § 1987-5 [P.P.C. § 359-9], provides, *inter alia,* that:

"Any person may file with the clerk of the superior court a petition showing that there is within the county, or residing within the county, a dependent or delinquent child and praying that the superior court deal with such child as provided in this act:  . . ."

Section 6 of the act, Rem. Rev. Stat., § 1987-6 [P.P.C. § 359-11], provides that:

"Upon the filing of an information, or the petition, the clerk of the court shall issue a summons requiring the person having custody or control of the child, or with whom the child may be, to appear with the child at a place and time stated in the summons,  . . ."

The same section later provides:

" . . . in any case when it shall be made to appear to the court that said summons will be ineffectual, a warrant may issue on the order of the court, either against the parent or guardian or the person having custody of the child, or with whom the child may be, or against the child itself.  . . ."

Section 8 of the act, Rem. Rev. Stat., § 1987-8 [P.P.C. § 359-15], reads in part as follows:

" . . . In any case in which the court shall find the child dependent or delinquent, it may in the same or subsequent proceeding upon the parent or parents, guardian, or other person having custody of said child, being duly summoned or voluntarily appearing, proceed to inquire into the ability of such persons or person to support the child or contribute to its support, and if the court shall find such person or persons able to support the child or contribute thereto, the court may enter such order or decree as shall be according to equity in the premises, and may enforce the same by execution, or in any way in which a court of equity may enforce its decrees.  . . ."

In *State v. Plastino,* 67 Wash. 374, 121 Pac. 851, the defendant was charged with having contributed to the delinquency of a minor female seventeen years of age.  The trial court sustained a demurrer to the information and dismissed the action.  On the state's appeal, the judgment of dismissal was reversed.  In the case cited, an entirely different situation from that in the case at bar was presented,

but we quote from the opinion the court's construction of the statute then in effect:

"The information was drawn under § 2004, Rem. & Bal. Code [Laws of 1909, chapter 153, p. 595], providing:

" 'In all cases where any child shall be a delinquent or neglected child, as defined by the statutes of this state, the parent or parents or persons having custody of such child, or any other person, responsible for, or by any act encouraging, causing or contributing to, the delinquency or neglect of such child, shall be fined . . . or imprisoned . . .'

"The court below applied the rule of *ejusdem generis* to the statute, and held that the words 'any other person' were controlled in their meaning by the specific enumeration of persons in the preceding clause, and for this reason only parents or other persons *in loco parentis* having custody of the child, could be informed against under this statute."

After a further discussion of the law, this court continued:

"Again we have this rule, that, where the particular words exhaust the class, the general words must refer to some larger class. [Citing cases.]

"This last rule is applicable to the statute under consideration. The words 'parent or parents, or persons having custody of such child,' exhaust the class. They embrace all persons in whose charge, keeping, or custody the child may be. No other words are needed to embrace all of such persons. They refer to parents, custodians, guardians and all who stand *in loco parentis*."

By Laws of 1913, chapter 160, § 17, p. 531, Rem. Rev. Stat., § 1987-17 [P.P.C. § 359-33], chapter 153, Laws of 1909, was amended, the portion of the amendatory section here pertinent reading as follows:

"In all cases where any child shall be dependent or delinquent under the terms of this act, the parent or parents, legal guardian or person having custody of such child, or any other person who shall by any act or omission, encourage, cause or contribute to the dependency or delinquency of such child shall be guilty of a misdemeanor, and upon conviction thereof, shall be punished by fine not exceeding one thousand dollars, or imprisonment in the county jail for not more than one year, or by both such fine and imprisonment, . . ."

The statute, as amended, varies in no essential particular from the previous statute, in so far as the language quoted from the opinion in the *Plastino* case is concerned.

In the case at bar, the unfortunate baby in question is clearly a dependent child, within the meaning of Rem. Rev. Stat., § 1987-8, *supra*. The trial court, in a carefully prepared memorandum opinion (which is contained in the statement of facts), expressed the view that Bess E. Gilroy, the relator and appellant herein, was an " 'other person having custody of said child,' " within the purview of Rem. Rev. Stat., § 1987-8, *supra*; that relator was clearly within the relationship of *in loco parentis* to the child, and that, until the child was formally adopted and an order of adoption signed by an appropriate court, relator was responsible for the care and maintenance of the baby. The court then signed the order from which relator has appealed.

The question before us for determination is whether the ruling of the trial court, above referred to, was correct.

In the case of *State v. Hemrich,* 93 Wash. 439, 447, 161 Pac. 79, L. R. A. 1917B, 962, this court quoted, with approval, the following:

" 'In statutory construction, the *"ejusdem generis rule"* is that where general words follow an enumeration of persons or things by words of a particular and specific meaning, such general words are not to be construed in their widest extent, but are to be held as applying only to persons or things of the same general kind or class as those specifically mentioned.' Black's Law Dictionary, p. 415."

We are in accord with the above-quoted language of this court from the opinion in *State v. Plastino, supra,* holding that the words of the statute (quoted in the opinion), " 'parent or parents, or persons having custody of such child,' exhaust the class," and that the statute refers to "parents, custodians, guardians and all who stand *in loco parentis.*"

In this connection, it should be noted that Rem. Rev. Stat., § 1987-6, *supra,* provides that a summons shall issue "requiring the person having custody or control of the child, or with whom the child may be," to bring the child before the court at a place and time stated in the summons. Appar-

ently, the legislature recognized that a child might be living with someone who would not have custody of the child, within the provisions of Rem. Rev. Stat., § 1987-8, *supra*.

We first consider the trial court's conclusion that relator was in the position of *in loco parentis* to the child.

In 39 Am. Jur. 697, § 61, appears the following:

"One who takes a child into his home and treats it as a member of his own family, educating and supporting it as if it were his own child, is said to stand to the child in loco parentis. While that relation continues, he is bound for the maintenance, care, and education of the child, and entitled to its reasonable services without pay, in the same manner as an actual parent. Guardians stand in loco parentis, and may be held liable to the child for failure to carry out the duties imposed on them in this connection. School-teachers, at least for purposes of discipline, stand in loco parentis, as also do college authorities.

"Where one stands in loco parentis to another, the rights and liabilities arising out of that relation are, as the words imply, substantially the same as between parent and child, although, of course, they may be enlarged or restricted by legislative enactment."

In 67 C. J. S. 803, § 71, the rule is stated as follows:

"The term 'in loco parentis' has been defined as in the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities; more specifically, the relationship which a person assumes toward a child not his own, holding the child out to the world as a member of his family toward whom he owes the discharge of parental duties. It has been said that the accepted definition of a person in loco parentis is one who means to put himself in the situation of a lawful parent to the child with respect to the office and duty of making provision for it; one assuming the parental character and discharging parental duties; a person standing in loco parentis to a child is one who has put himself in the situation of a lawful parent by assuming the obligations incident to the parental relation, without going through the formalities necessary to a legal adoption."

We also quote from § 72, p. 804, of the same text:

"Where one is in loco parentis the rights, duties, and liabilities of such person are the same as those of the lawful

parent. The assumption of the relation is a question of intention, and not of chance, which may be shown by the acts and declarations of the persons alleged to stand in that relation."

The following definitions of the phrase *"in loco parentis"* are found in standard law dictionaries:

"In the place of a parent. A person in loco parentis to a child is a person who means to put himself in the situation of the lawful father of the child, with reference to the father's office and duty of making provision for the child,— a person assuming the parental character and discharging parental duties." Ballentine's Law Dictionary, p. 653.

"In the place of a parent; instead of a parent; charged, factitiously, with a parent's rights, duties, and responsibilities." Black's Law Dictionary (2d ed.), p. 604.

■ Under the authorities, it seems clear that the relationship of *in loco parentis* becomes established only when a person intends to assume toward a child the status of a parent. This principle is also recognized in the case of *Niewiadomski v. United States,* 159 F. (2d) 683. It is true that courts have observed that teachers, while pupils are under their direction, occupy the parental relationship for purposes of discipline only, but authorities recognizing that principle are not here in point.

Respondent cites several authorities, including *In re Fields,* 56 Wash. 259, 105 Pac. 466, in which the relator sought a writ of *habeas corpus* for the purpose of recovering custody of a minor illegitimate son, who, at the time of the trial, was thirteen years of age. Soon after the birth of the child, the mother had placed him in the care of certain persons, but, as the child did not thrive, she placed him in what is referred to as a "child hospital," intending to resume custody of the child when she was financially able to do so. After an absence of three weeks, she went to the hospital to see the baby and was informed that it had been placed with a family, the hospital refusing to tell her the name or address of the people to whom the child had been delivered. Later, she employed a detective and discovered the name of the couple who had the child.

During the month of July, 1898, the mother applied for a writ of *habeas corpus* in St. Louis, but, after a hearing, the cause was continued and, when again called, it was dismissed without prejudice on motion of the mother's counsel. Upon learning that the case had been dismissed, the mother testified that she again endeavored to locate the child but was unable to do so until the year 1905, when she learned that he was in the possession of the couple at Bellingham, Washington. She then instituted a *habeas corpus* proceeding in Whatcom county.

This court, speaking through Dunbar, J., stated that the two principal questions presented were (1) whether the child had been abandoned by relator before its adoption, and (2) whether the relator had abandoned the custody of the child after the dismissal of the *habeas corpus* proceeding in St. Louis. This court held that the mother had abandoned the child after the dismissal of the first *habeas corpus* proceeding and affirmed the order of the trial court discharging the writ.

Respondent argues that, under the case cited, it should be held that the mother in the case at bar had absolutely abandoned the child; that the relator herein had absolute custody of the baby and was free to do with him as she wished; and that, therefore, relator should be required to support the child.

We are not here concerned with equitable principles, but with the construction of the statutes of this state. If, under Rem. Rev. Stat., § 1987-8, *supra,* relator is a "person having custody of said child," the order of the trial court should be affirmed. But if, under the facts and the law as declared by this court, relator should not be classed within the scope of the statute, the order appealed from should be reversed.

The *Fields* case is not here controlling.

Respondent also cites *In re Sipes,* 24 Wn. (2d) 603, 167 P. (2d) 139, arguing that, under that authority, it should be held that a person in relator's position has permanent custody of the child. In the case cited, it appeared that Joan Sipes, an unmarried woman, had given birth to an ille-

gitimate child. She had signed a formal consent to the adoption of the baby by Mr. and Mrs. A. A. Shaw, who later filed before the superior court for Okanogan county a petition praying for a decree establishing their adoption of the baby. A decree of adoption, containing a provision that it should "remain interlocutory for a period of six months," was signed. Within that period, the mother filed a petition to vacate the decree. A hearing was held upon her petition, the mother contending that her consent to the adoption had been procured by misrepresentations and undue influence. It was also argued that Laws of 1939, chapter 162, p. 485, Rem. Rev. Stat. (Sup.), § 1700-1 [P.P.C. § 358-1] *et seq.*, applied to the situation presented, and that, because certain provisions of the statute had not been complied with, the order of adoption was void. Rem. Rev. Stat. (Sup.), § 1700-1, reads in part as follows:

"It shall be unlawful for any person, firm, society, association or corporation, except the parents, to assume the permanent care, custody or control of any child under the age of majority, unless authorized so to do by a written order of a superior court of the state. It shall be unlawful, without the written order of the superior court having first been obtained, for any parent or parents to in anywise relinquish or transfer to another person, firm, society, association or corporation, the permanent care, custody or control of any child under the age of majority, and any such relinquishment or transfer shall be void: . . ."

Evidently, the statute was enacted to control the activities of so-called maternity hospitals and persons who undertake to dispose of infants by placing them in family homes for adoption. The mother argued that she had never requested leave to relinquish her child, and that no order of relinquishment had ever been entered by any court, as required by the statute.

This court declared that the purpose of the act "was to prevent the bartering of minor children," but that the statute did not apply to a situation such as that presented in the case before the court. The order of the trial court refusing to vacate the decree of adoption was affirmed.

Respondent argues that, in the case last cited, this court in some manner recognized that a person or institution may have the custody of a minor child, without having previously obtained the court order provided for by Rem. Rev. Stat. (Sup.), § 1700-1, *supra*. The opinion does not warrant such a conclusion.

While relator did have physical possession of the baby here in question, in the absence of the court order referred to in the statute, she did not have the "permanent care, custody or control" of the infant. This would be true, even though the child's mother had abandoned it, but whether the mother had, in fact, abandoned the child need not be determined in this proceeding.

In respondent's brief, referring to the situation that existed after the child was returned to the relator by the couple who had contemplated adopting it, it is said: "Of course, as a practical matter, the natural mother of the child could undoubtedly have regained his custody."

The case of *In re Sipes, supra,* is not here controlling.

Respondent also cites the following from 67 C. J. S. 805, § 72:

"*A charitable institution* having statutory power to receive deserted children stands to them in loco parentis."

The only authority cited in support of the above-quoted text is *In re Korte,* 78 Misc. Rep. 276, 139 N. Y. Supp. 444, in which Mr. Korte sought an order authorizing his adoption of two minor children, foundlings who had been placed in the custody of Mr. Korte and his wife (who had died prior to the institution of the adoption proceeding). The children had been delivered to Mr. and Mrs. Korte by the New York Foundling Hospital, a Catholic institution, which had statutory authority to receive deserted children and others who had been surrendered to it, and to place the children in homes by indenture or adoption. The foundling hospital appeared in the proceeding and opposed the petition, stating that, when Mr. and Mrs. Korte received the children, they promised to rear them in the Roman Catholic faith. It appeared that Mrs. Korte had been a Catholic, but Mr.

Korte was not, and the hospital contended that the children were not being reared in the Catholic faith. The whereabouts of the natural parents of the children was unknown. The hospital further contended that the "agreements of indentures" delivered to the Kortes were not intended as consents to the legal adoption of either of the children, taking the position that, without the hospital's consent, the court had no power to grant the order of adoption prayed for.

The court was of the opinion that, under the facts and circumstances of the case, the hospital stood in the position of *in loco parentis* to the children and that its consent was necessary before the petition could be granted. The court suspended its ruling on the petition for six months.

As the foundling hospital had legal authority to accept the care of the children and contended that its consent was necessary before Mr. Korte's petition could be granted, the court's view that the hospital stood *in loco parentis* to the children, until they were legally adopted with its consent, was justified. Of course, the situation of the hospital referred to differs greatly from that of relator here, as the hospital had statutory authority to receive children and place them for adoption. The authority cited is not here in point.

Under the law, relator could not be vested with the permanent care, custody or control of the child until an order of the superior court had been entered pursuant to Rem. Rev. Stat. (Sup.), § 1700-1, *supra*. It does not appear that the child's mother desired or intended to vest relator with such custody, as she left the baby with relator, telling her to turn the child over to the Wapato couple, with whom the mother was acquainted and to whom she was probably related. The consent to adoption which the mother signed, although in blank, was clearly intended to apply to the persons above mentioned.

From the opinion in *State v. Gilroy, ante* p. 41, 221 P. (2d) 549, it appears that relator here was charged, by count I of an information filed against her, with having "wilfully

and unlawfully carried on the work of caring for children and adults and placing children for care without having a certificate of approval," and, by count II, with having placed an infant " 'in a family home for adoption prior to the time an order of relinquishment had become final.' " From the original record, it appears that the infant referred to was "Baby Boy Cole," whose status in regard to relator is here in question. In the proceeding referred to, the relator here demurred to both counts of the information, and, her demurrer having been sustained, the state appealed. The judgment appealed from was affirmed by this court.

We are here concerned only with relator's status in connection with the child in question, and her responsibility for the child's support.

■ The record before us discloses no legal basis for respondent's contention that relator is, or ever was, a "person having custody of" the child in question, within the purview of Rem. Rev. Stat., § 1987-8, *supra,* or that relator has ever been in the relationship of *in loco parentis* to the child.

That portion of the order or judgment appealed from which directed relator to pay into the registry of the court the sum of sixty dollars a month for care of the child, until further order of the court, is reversed and the cause remanded, with instructions to strike the portion referred to from the order.

SCHWELLENBACH, C. J., ROBINSON, HILL, and DONWORTH, JJ., concur.