74 P.3d 674 (2003)
118 Wash.App. 71
In re the CUSTODY OF S.H.B. (DOB: 11/19/92).
Gail M. Luby, Appellant,
v.
Beth Da Silva and Lisa Sherman, Respondents.
No. 50681-1-I.
Court of Appeals of Washington, Division 1.
August 18, 2003.
Reconsideration Denied September 25, 2003.
*677 Margaret K. Dore, Attorney at Law, Seattle, WA, for Appellant Gail Luby.
Stephen Brown, pro se.
Rachel Pierce, pro se.
Michael David Hunsinger, Hunsinger & Associates Sutkus & Kestle, Seattle, WA, for Respondents.
Elizabeth Kaye Selleck, Attorney at Law, Karma L. Zaike, Michael W. Bugni & Associates, Seattle, WA, for Family Law Casa Program. *675
*676 BAKER, J.
S.H.B. lived with her paternal grandmother, Gail Luby, for six years until Luby was arrested for growing a large quantity of marijuana. Beth DaSilva, the maternal grandmother, removed the child and placed her with the child's godmother, Lisa Sherman. Both Luby and Sherman brought actions for custody. Following a trial, the court decided that the best interests of the child would be served if she resided with Lisa Sherman. Luby appeals, arguing that because she was the child's effective parent, the court was required to find actual detriment to the child before removing her from Luby's household. Luby also argues that even under a best interest of the child standard, there was insufficient nonhearsay evidence to change the child's residential placement. Finally, Luby challenges the court's reliance on the parental access evaluation, which recommended placement with Sherman. But Luby did not object to the parental access evaluation either before or at trial. And the standard in nonparent custody actions under the pertinent statute is the best interest of the child. Accordingly, because the trial court's decision is supported by substantial evidence, we affirm.

I
S.H.B. has lived with her paternal grandmother, Gail Luby, since she was two years old. Luby began caring for S.H.B. immediately after S.H.B. had heart surgery. The parents both suffered from chronic drug addiction, and could not provide a stable living environment. The father has also been diagnosed with bipolar disorder, and the mother is an alcoholic. S.H.B. has had sporadic contact with her mother and fairly regular contact with her father.
Shortly before the child's eighth birthday, Luby was arrested for growing a large quantity of marijuana. Luby admitted to growing marijuana since 1997. Luby also admitted to smoking marijuana, using it to make oils, giving it to friends, and supplying it to adults at S.H.B.'s birthday parties. Luby stated that the last time she smoked marijuana was the day the marijuana grow operation was discovered in her home. On that night, officers seized 33 mature marijuana plants, 125 starter plants, cash, and small packaged amounts of marijuana. The estimated value of the 33 mature marijuana plants was $66,000. The lead officer in the raid testified that Luby told him she sold marijuana for $250 to $300 an ounce. Luby was then arrested and pled guilty to manufacturing an illegal drug.
DaSilva did not express any concerns about S.H.B.'s living arrangements until after Luby's home was raided and Luby was arrested in the fall of 2000. DaSilva then began to more closely observe what was going on at Luby's house. Shortly after Luby was released from jail, DaSilva witnessed people smoking marijuana in Luby's house *678 when she dropped S.H.B. off after a scheduled visit.
Luby's home was a boarding house. Luby and S.H.B. lived on the second floor, while three male boarders lived on the first floor. All of the living spaces, including the kitchen, living room, and dining room, were common areas. One of the boarders in the home was Luby's son, Shamus Luby. Luby described Shamus as a practicing alcoholic who was also diagnosed with bipolar disorder. Shamus Luby has not seen a doctor or taken medication for his disorder for four years. Another boarder, Marty Bennett, testified that Shamus smoked marijuana in Luby's home after her arrest. Luby admitted that she did not use any kind of interview or application process when bringing boarders into her home.
During the trial, Gail Luby testified about her relationship with her partner Harry Bloss. She acknowledged that Bloss suffers from posttraumatic stress disorder and that he smokes marijuana on a daily basis to cope with his psychological problems. She also admitted that Bloss is prone to violent episodes that leave him hospitalized. Luby and S.H.B. lived with Bloss for a short period of time after Luby was released from jail. During this time, Luby would allow Bloss to drive S.H.B. to school while he was apparently under the influence of marijuana.
Before trial, the court appointed a volunteer Court Appointed Special Advocates Guardian Ad Litem (GAL) for the child. Later, the court appointed Dr. Marsha Hedrick to conduct a parenting access evaluation and make recommendations on custody. Both Dr. Hedrick and the GAL prepared reports that were submitted into evidence without objection, and used by the court in reaching its decision.
As part of her parenting access evaluation, Dr. Hedrick administered psychological tests to each party. She found Luby to be defensive because of her tendency to convert emotional distress into physical symptoms. She also found that Luby displayed elevated manic and narcissistic tendencies which manifest themselves as erratic, impulsive, and hyperactive behavior. Dr. Hedrick explained in her report and at trial that her personal observations of Luby's behavior supported her findings from the psychological tests. She also testified that persons with these attributes are not very good at being aware of other people's feelings and have a tendency to be manipulative. According to the evaluator, Luby's personality and these characteristics manifested themselves in the environment Luby provided for S.H.B.:
I thought [Gail Luby] had little sophistication and little awareness, little empathy and in particular with regard to what [S.H.B.] needed, both emotionally and in terms of protection that most children get protected from more than [S.H.B.] does.[1]
Dr. Hedrick also testified that although the child appeared to be well adjusted, she in fact was not receiving the nurturing she needed, and her disposition masked her needs:
She watches carefully for what people around her need, and she supplies it. And that's all well and good, certainly serves children well. They are well regarded, well liked by adults because they are so compliant and so attentive. But the reality is it's often a pattern that's also associated with someone whose needs aren't being met as a child.[2]
Both in her report and at trial, Dr. Hedrick concluded that Luby's household presented an increasingly questionable and potentially detrimental environment as S.H.B. approached adolescence.
The first GAL report was prepared six months prior to the parenting access evaluation. The GAL observed that at Luby's home "[t]here is a quick pace"[3] and that there is "a large group of people constantly coming and going."[4] Her report also acknowledged *679 that Luby's children "have substantial involvement with the law,"[5] and expressed concern that Luby did not understand the impact that her actions and associations had on S.H.B. Nevertheless, the GAL initially recommended that S.H.B. remain with Luby.
After Dr. Hedrick's report, the GAL revised her recommendation based on risks identified in the report, including the continued use of marijuana by Luby's partner, lack of supervision or supervision by adults with criminal or chemical dependent histories, and the adult-focused atmosphere of Luby's household. She also testified that "[Luby] doesn't realize the impact that adults can have on a child, especially as she grows into being a teenager."[6] And she cautioned that Luby's household "doesn't seem to me [to be] an appropriate place for her to grow into, to be a teenager."[7]
At trial, neither Harry Bloss nor Shamus Luby testified. The trial court awarded residential placement to Sherman.

II
In matters dealing with the welfare of children, trial courts are given broad discretion.[8] A trial court's decision involving custody and visitation rights will not be disturbed on appeal unless the court manifestly abused its discretion.[9] A trial court abuses its discretion when its decision is manifestly unreasonable or based on untenable grounds.[10] We will uphold a trial court's findings of fact if they are supported by substantial evidence.[11]

Nonparent Custody Actions Are Governed by RCW 26.10.030
RCW 26.10.030 allows nonparents to petition for custody of a child. The statute requires that a nonparent petitioner file the action in the county where the child lives and show either that the child is not in a parent's physical custody, or that neither parent is a suitable custodian. If the child is in the custody of a parent, to gain custody the petitioner must establish that the parent is unfit, or that continuing to reside with the parent would "`detrimentally effect [sic] the child's growth and development.'"[12] If the child does not reside with either parent, then the statute requires that the petitioner establish that awarding them custody is "in the best interest of the child."[13]

Persons Acting as In Loco Parentis Are Not "Parents" Under Chapter 26.10 RCW
The Washington Supreme Court has explained that a person acting as "in loco parentis" functions in the place of a parent and is charged with a parent's rights, duties, and responsibilities.[14] But this action is under chapter 26.10 RCW, which provides no special status to persons acting in loco parentis. Thus, we reject Luby's argument that because she acted as in loco parentis, she is entitled to the rights of parents under RCW 26.10.030.
At common law, a parent was either the biological mother or biological father *680 of a child.[15] Nonparentsincluding adoptive parents, legal guardians, grandparents, and persons acting in an in loco parentis capacitydo not have the same constitutional rights of a parent, absent legislative action.
The Legislature has supplemented the common law definition of parent through both the Uniform Parentage Act,[16] and the Adoption Act.[17] The Uniform Parentage Act defines who is a parent for all purposes.[18] Under the Act, a parent may be a biological or adoptive parent, or someone who has a surrogate parentage contract under which the mother is an intended parent of the child.[19] The Adoption Act also defines parent, but limits the definition to only those persons who are natural or adoptive parents.[20] Luby does not satisfy the definitions set forth in either of these statutes.
Because third party custody proceedings are governed by statute, Luby's rights in such proceedings are statutorily based. No provision in these statutes grants persons such as Luby parental status.
To support her argument that she is a parent under the statute, Luby cites to In Re Welfare of Hansen.[21] In Hansen, a court removed a child from her legal guardians and placed her with her natural mother without affording the guardians the opportunity to testify at the hearing.[22] The court of appeals reversed, and ordered the trial court to conduct a hearing:
The Corderos are not Tammy's natural parents; nevertheless, they have stood in the relation of in loco parentis to the child for many years. The rights and liabilities arising out of the in loco parentis relationship are substantially similar to the relationship between parent and child.[23]
The court went on to explain that the Corderos' status as guardians entitled them to a meaningful opportunity to be heard in the context of the mother's attempt to terminate the guardianship. Hansen does not stand for the proposition that persons "in loco parentis" stand in the same shoes as parents under RCW 26.10.030.
Luby also argues that RCW 13.34.020 recognizes the tension between the need to keep families intact, and the concern that children have safe, healthy homes:
The legislature declares that the family unit is a fundamental resource of American life which should be nurtured. Toward the continuance of this principle, the legislature declares that the family unit should remain intact unless a child's right to conditions of basic nurture, health, or safety is jeopardized. When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail ... the child's health and safety shall be the paramount concern. The right of a child to basic nurturing includes the right to a safe, stable, and permanent home and a speedy resolution of any proceeding under this chapter.[24]
But this statute does not define parent, nor does it confer the legal designation of parent on Luby. Instead, the statute recognizes *681 the goal of fostering families as long as this goal does not jeopardize the health of the child.[25]
We conclude that although S.H.B. resides with Luby, Luby is not a parent under any statutory definition, and she is not afforded the presumption of parental fitness under RCW 26.10.030.

The Court is Not Required to Defer to a Parent's Prior Placement When Determining Custody
Luby argues that the trial court was required to defer to the biological parents' designation of her as custodian. We note that she raised this issue for the first time in her posttrial memorandum, and that this issue is not properly before the court. But in the interest of clarity, we address the issue.
Luby claims that absent a finding of parental unfitness, there is no basis to challenge the parents' decision to place S.H.B. with her. As support, she cites to chapter 13.34 RCW for the proposition that even unfit parents are allowed parental authority.[26] But this is not a dependency proceeding. Chapter 13.34 RCW is inapplicable in this context. In this proceeding, the trial court was required to decide the child's appropriate placement based on the best interest of the child. That decision is neither preempted nor circumscribed by a parent's earlier placement decision.

The Standard of Proof in Nonparent Custody Actions is by a Preponderance of the Evidence
Luby next argues that the standard of proof in cases of this type should be by clear and convincing evidence. Underlying this argument is her assertion that as a parent, she is entitled to the protections afforded under Washington's dependency statute. She cites to In Re Dependency of J.W.H.[27] for the proposition that third party custody actions are analogous to dependency actions.[28] But in the context of dependency actions under chapter 13.34 RCW, we have held that "a preponderance standard provides adequate due process in guardianship proceedings."[29] Underlying this holding is the fact that guardianship proceedings do not terminate a parent's rights:
Contrary to appellants' assertion, the impact of guardianship on the parent/child relationship is not tantamount to termination. Guardianship is not permanent, nor is it irreversible, and it does not sever all rights of the parent in the child.[30]
Here, the residential placement order did not terminate S.H.B.'s parents' rights. Unlike dependency and termination proceedings under chapter 13.34 RCW, nonparent custody actions under chapter 26.10 RCW do not terminate parental rights. Instead, the court determines by a preponderance of the evidence that it is in the best interest of the child that she be placed with one of the parties.[31] The order may be revisited at a later time.[32] Here, the court properly determined placement based on the preponderance of the evidence.

The Parenting Access Evaluation
On appeal, Luby challenges the parenting evaluation, arguing that it was "irrelevant, unreliable and unduly prejudicial."[33] She also challenges the court's reliance on a court-appointed expert. She claims that parenting evaluators are unfair and biased, and *682 that their use by courts unfairly shifts the burden of proof at trial.
Luby did not object to the parenting access evaluation report either in the pretrial joint statement of evidence, as required in the pretrial order, or at trial.[34] And in her pretrial brief submitted to the court she recommended that the court disregard the expert's recommendation and instead apply the factors in RCW 26.09.187 to determine S.H.B.'s best interests. Accordingly, her burden shifting argument is untimely. We note, however, that the fact that an evaluator's report favors one party does not operate to shift the burden of proof otherwise required by law.
Under RCW 26.09.220, the court is authorized to utilize such reports.[35] Although the provision is found in chapter 26.09 RCW rather than chapter 26.10 RCW, the underlying purpose, to assist the trial court in determining who is best suited to serve as the primary residential custodian, is the same.
Luby infers in her brief that she was not given adequate time to rebut the allegations of unfitness and inappropriate behavior in the report. But the evaluator submitted the report to the parties seven weeks before trial. The statute only requires that the evaluator submit the report to the parties not later than ten days before trial. Luby also infers in her brief that because the report was issued over the Christmas holidays, she was not given adequate time to prepare for trial. But she provides no evidence that she objected to the timing of the report, or that she was prejudiced by its timing.
Luby also alleges that the evaluator based her decisions on inappropriate factors. She focuses on the evaluator's discussion of allegations of past sexual abuse by Luby's resident son, Shamus. Luby also challenges hearsay from the report, arguing that it taints the evaluation.
Although the trial court considered the evaluator's report and trial testimony in deciding where S.H.B. should reside, the court did not in any way abdicate its responsibility to independently determine the findings of fact. For example, the court did not rely on Dr. Hedrick's discussion of past sexual abuse to determine residential placement. In the findings of fact, the court explained that:
The court cannot establish that this sexual abuse occurred, but it is not necessary for the court to make such a finding because there are other concerns about Shamus' presence in the household.[36]
The court instead expressed concern about evidence at trial establishing that Shamus had an untreated bipolar disorder, and that he used drugs and alcohol as a possible way to manage or medicate this problem.
Luby also argues that the report was unreliable because the evaluator did not meet each of the parties about whom she *683 expressed concern. But the purpose of parenting evaluations is to evaluate the petitioning parties and recommend which would provide the most stable, beneficial environment for the child. The evaluator considered the emotional and the physical environment of the respective households in making her recommendation. Her report was based on comprehensive tests, interviews with the parties, and observations about how they interacted and reacted to questions. The evaluator was not required to ignore allegations of substance abuse, sexual assault, and untreated mental disorders in interviewing the parties and compiling her report.

Under RCW 26.10 the Court Looks to the Child's Best Interest and Not Whether There is Actual Detriment
Luby also argues that even if she is not a parent, the court was required to establish actual detriment to S.H.B. from her current living circumstances in order to remove her. But Luby argued in her trial brief that the trial court should apply the best interest test found in RCW 26.09.187, explaining that "[i]t would be error for the court not to follow the guidelines"[37] found in RCW 26.09.187. Because she did not raise this argument until after the trial, she is foreclosed from arguing it here.

RCW 26.10.100 is Constitutional
Luby argues that the best interest standard in RCW 26.10.100 is an unconstitutional deprivation of her right to due process of law. We disagree. Statutes are presumed to be constitutional.[38] Washington courts have consistently applied the best interest of the child test to determine custody.[39] Although Luby argues that this standard violates her due process rights, we have consistently adhered to the principle that the welfare of the child always remains paramount.[40]
Luby cites to Troxel v. Granville[41] and the dissent in In re Custody of R.R.B.,[42] to argue that the statute is unconstitutional. She cites Troxel for the proposition that the State cannot interfere with the private realm of the family absent a showing of unfitness.[43] But again, Luby's argument is predicated on her being a parent under the statute. Troxel concerned the constitutionality of a statute which allowed nonparents to interfere with the decision-making authority of a fit parent without a showing of harm. Although Luby acted as in loco parentis, she is not S.H.B.'s parent. Troxel is inapposite.
Luby also relies on the dissent in In re R.R.B., which argued that because Troxel had invalidated the "best interest" test in former RCW 26.10.160 (1996), the "best interest" test in RCW 26.10.100 was unconstitutional for similar reasons:
The statute at issue here, RCW 26.10.100, contains the very same test. As a result, it is unconstitutional to the same extent that RCW 26.10.160 and 26.09.240 were unconstitutional in Troxel and Smith, and we should reverse in the same way those cases reversed.[[44]]
But In re R.R.B. involved a biological parent's challenge to the adoptive parents' custody. The trial court afforded the parental presumption to the adoptive parents, and only awarded custody to the biological father *684 because he had established that remaining with the adoptive parents would "detrimentally affect [the child's] growth and development."[45] The court of appeals affirmed, concluding that once the petitioning party established that the parents were unfit or that continuing to reside with the parents would harm the child, "the court need not defer to the parents' decisionmaking at every turn."[46]
As a nonparent, Luby is not afforded this parental presumption. Troxel only invalidated the use of the best interest test by a third-party to impinge on parents' constitutional right to raise their children without state interference.[47]Troxel did not invalidate the use of the best interest test as between parents, or between nonparents. The best interest of the child standard is the correct standard in an action between nonparents petitioning for custody under RCW 26.10.030.

The Record Supports the Court's Conclusion That Residing With Sherman Was in S.H.B.'s Best Interest
Although RCW 26.10.100 does not define the "best interest" test, we have explained that the best interest test "compares the parents' competing home environments and awards custody, by a preponderance of the evidence, for the better environment."[48] Moreover, "best interest" has been legislatively defined throughout the domestic relations chapter.[49] Considerations the Legislature deems important for determining a "child's best interest" include providing for the child's emotional stability and growth, and minimizing the need for modifications as the child's needs change.[50]
Here, the trial court determined that continuing to reside with Luby was not in S.H.B.'s best interest. The court found that Luby consistently used poor judgment when making decisions regarding S.H.B. The court disapproved of Luby's allowing Bloss to be one of S.H.B.'s role models. The court found that permitting Bloss to play a substantial role in S.H.B.'s life was a threat to the child's safety. The court also found that the fact that Luby had run a major marijuana grow operation in her home had posed a threat to S.H.B.'s safety, and that the constant presence and use of marijuana in Luby's home communicated a message to S.H.B. that the use of illegal drugs was acceptable. The court was also concerned that Luby allowed boarders with untreated mental disorders and alcohol problems to reside in her home. The court expressed concern that Luby did not conduct interviews or use an application process before allowing the boarders to move in.
These findings of fact are amply supported by the evidence in the record. Substantial evidence also supports the finding that Luby's home was a poor environment in which to raise S.H.B. Perhaps the most damaging aspect of the evaluator's report concerns Luby's decision-making. The report explained that Luby:
has difficulty making decisions which put the needs of others first, most specifically her children. Each of her children appears to have significant behavioral issues. Gail attempts to normalize or deny these difficulties, or attributes them to mental health issues they inherited from their fathers. However, significant erratic and inadequate parenting is also apt to be part of this pattern. Gail's continued difficulties in recognizing how to construct an appropriate environment for a child are evident in the household currently. Her difficulty maintaining appropriate boundaries between child and adult issues is evident.... [[51]] *685 The evaluator surmised that this chaotic environment might be the reason why S.H.B. was pleasant, but guarded about extending herself emotionally.
At trial, Dr. Hedrick testified that in her opinion, recommending placement of S.H.B. with Sherman "was not a difficult call."[52] Dr. Hedrick was disturbed by S.H.B.'s exposure to adults with untreated mental illness, drug use in Luby's home, and Luby's inability to make responsible decisions. The evaluator further testified that:
I'm concerned that she gets exposed to a lot of adults who clearly have lots of problems. And that nobody makes an attempt to shelter her from that. There seems to be sort of this idea that, oh, well, she will cope. And I think she is exposed to drug use. I think she is exposed to alcohol use. I think she is exposed to people's very erratic mood fluctuations, people behaving irresponsibly.... I think so far its not causing her huge difficulties, but I think as she approaches adolescence, it will. I mean, just the exposure to sub-culture that endorses a lot of drug use is dangerous for any adolescent.[53]
Dr. Hedrick's testimony, without considering the issue of Shamus' alleged prior sexual abuse, provides ample support for the court's decision that remaining with Luby is not in S.H.B.'s best interest.
Luby argues in the alternative that the trial court did not explicitly apply the best interest to the child factors in RCW 26.09.187, and that this alone requires reversal. She claims that the court did not articulate reasons for its decision, necessitating reversal. However, the court clearly explained in its findings of fact and conclusions of law that "[t]he court's conclusions concerning the best interests of the child(ren) are based on the following facts...."[54] Considering the testimony and evidence submitted at trial in light of the factors outlined in RCW 26.09.187, substantial evidence supports the trial court's decision awarding custody to Sherman.

Denial of Opportunity to Correct Deficiencies
Analogizing again to the rights of a parent involved in a dependency proceeding under chapter 13.34 RCW, Luby argues that the trial court should have established conditions for her to meet, under the court's supervision, so that she could correct any problems and "make changes so as to allow [S.H.B.] to stay."[55] Once again, we point out that this is not a dependency proceeding, and Luby is not a parent.
Moreover, the trial court did not question Luby's willingness to try to respond to the court's stated concerns. But the court was understandably unwilling to micromanage Luby's household. The critical problem the court found was that Luby was unable to independently and responsibly function as an appropriate parental figure for S.H.B. As the court stated in its oral ruling, she could impose a variety of conditions, but this would mean:
I would have to be the probation officer in this case to see if the conditions were met and who was there and who wasn't. And that's what I resisted ... it's too late for that in some ways. I can't be the one who manages this case and imposes the conditions. These events and individuals have posed a threat and have been an ongoing presence in this child's life.[56]

Attorney Fees
Both Luby and Sherman seek attorney fees on appeal. Luby cites RCW 26.10.080, which grants the court power to award fees at the trial level based on financial resources. The trial court did consider the parties resources, and required Luby to pay $1,000 toward Sherman's fees, and $500 toward the cost of the parenting evaluator (out of nearly $7,000).
*686 RCW 26.10.080 gives this court discretion to award attorney fees on appeal:
Upon any appeal, the appellate court may, in its discretion, order a party to pay for the cost to the other party of maintaining the appeal and attorney's fees in addition to statutory costs.[57]
Here, affidavits submitted by both Luby and Sherman show that they each have financial need. Accordingly, we decline to award attorney fees on appeal to either party.
Finally, we find no merit in Luby's request that this case be assigned to a different trial court judge in the event of further proceedings. Judge Yu carefully and responsibly made a difficult but correct decision.
AFFIRMED.
WE CONCUR: GROSSE, KENNEDY, JJ.
NOTES
[1] 2 Verbatim Report of Proceedings (VRP) (Feb. 6.2002) at 17.
[2] 2 VRP (Feb. 6.2002) at 35.
[3] Ex. 27 at 6.
[4] Ex. 27 at 9. One of Luby's friends told the GAL that "[t]here is never a dull moment in the Luby household. The sheer number of people, perspectives and needs makes for a lot of clamor and creativity. When I visit, I try to pace myself as it takes a few days to adapt...." Ex. 27 at 10.
[5] Ex. 27 at 10.
[6] VRP (Feb. 7.2002) at 137.
[7] VRP (Feb. 7.2002) at 135.
[8] In re Marriage of Cabalquinto, 100 Wash.2d 325, 327, 669 P.2d 886 (1983); Schuster v. Schuster, 90 Wash.2d 626, 632, 585 P.2d 130 (1978); Joslin v. Joslin, 45 Wash.2d 357, 364, 274 P.2d 847 (1954).
[9] Schuster, 90 Wash.2d at 632, 585 P.2d 130; Munoz v. Munoz, 79 Wash.2d 810, 813-14, 489 P.2d 1133 (1971).
[10] In re Marriage of McDole, 122 Wash.2d 604, 610, 859 P.2d 1239 (1993); In re Marriage of Kovacs, 121 Wash.2d 795, 801, 854 P.2d 629 (1993).
[11] McDole, 122 Wash.2d at 610, 859 P.2d 1239; Chapman v. Perera, 41 Wash.App. 444, 449, 704 P.2d 1224 (1985).
[12] See In re Custody of Stell, 56 Wash.App. 356, 364, 783 P.2d 615 (1989) (quoting In re Marriage of Allen, 28 Wash.App. 637, 626 P.2d 16 (1981)).
[13] RCW 26.10.100 ("The court shall determine custody in accordance with the best interests of the child.").
[14] State ex rel. Gilroy v. Superior Court for King County, 37 Wash.2d 926, 933, 226 P.2d 882 (1951).
[15] State ex rel. D.R.M. v. Wood, 109 Wash.App. 182, 189, 34 P.3d 887 (2001).
[16] RCW 26.26.011; see also RCW 26.26.101.
[17] RCW 26.33.020.
[18] See D.R.M. v. Wood, 109 Wash.App. at 189, 34 P.3d 887 (recognizing that UPA is statutory process for determining whether parent-child relationship exists).
[19] See RCW 26.26.011(12) ("`parent' means an individual who has established a parent-child relationship under RCW 26.26.101."); RCW 26.26.101 (recognizing birth, adoptive, and surrogate parties as parents).
[20] RCW 26.33.020 provides in part:

"Parent" means the natural or adoptive mother or father of a child, including a presumed father under chapter 26.26 RCW. It does not include any person whose parent-child relationship has been terminated by a court of competent jurisdiction.
RCW 26.33.020(8).
[21] 24 Wash.App. 27, 599 P.2d 1304 (1979).
[22] Hansen, 24 Wash.App. at 30, 36, 599 P.2d 1304.
[23] Hansen, 24 Wash.App. at 36, 599 P.2d 1304.
[24] RCW 13.34.020.
[25] See In re Dependency of H.W., 70 Wash.App. 552, 555, 854 P.2d 1100 (1993).
[26] RCW 13.34.260 states that "[p]arental authority is appropriate in areas that are not connected with the abuse or neglect that resulted in the dependency."
[27] 147 Wash.2d 687, 57 P.3d 266 (2002).
[28] In re J.W.H., 147 Wash.2d at 696, 57 P.3d 266.
[29] In re Dependency of F.S., 81 Wash.App. 264, 268-69, 913 P.2d 844 (1996).
[30] In re F.S., 81 Wash.App. at 269, 913 P.2d 844.
[31] RCW 13.34.231(6) provides:

A guardianship, rather than termination of the parent-child relationship or continuation of efforts to return the child to the custody of the parent, would be in the best interest of the child.
[32] We note that Judge Mary Yu retained jurisdiction in this matter.
[33] Appellant's Reply Brief at 26.
[34] See Clerk's Papers at 1029 (pretrial joint statement acknowledging that report would be admitted and not objecting); Clerk's Papers at 109 (order on pretrial conference requiring any legal basis to objection to be provided to the court no later than five days before trial).
[35] RCW 26.09.220 provides:

(1) The court may order an investigation and report concerning parenting arrangements for the child, or may appoint a guardian ad litem pursuant to RCW 26.12.175, or both. The investigation and report may be made by the guardian ad litem, the staff of the juvenile court, or other professional social service organization experienced in counseling children and families.
(2) In preparing the report concerning a child, the investigator may consult any person who may have information about the child and the potential parenting or custodian arrangements.... If the requirements of subsection (3) of this section are fulfilled, the investigator's report may be received in evidence at the hearing.
(3) The investigator shall mail the investigator's report to counsel and to any party not represented by counsel at least ten days prior to the hearing unless a shorter time is ordered by the court for good cause shown. The investigator shall make available to counsel and to any party not represented by counsel the investigator's file of underlying data and reports, complete texts of diagnostic reports made to the investigator pursuant to the provisions of subsection (2) of this section, and the names and addresses of all persons whom the investigator has consulted. Any party to the proceeding may call the investigator and any person whom the investigator has consulted for cross-examination. A party may not waive the right of cross-examination prior to the hearing.
[36] Findings of Fact 21.
[37] Clerk's Papers at 170.
[38] State v. Heckel, 143 Wash.2d 824, 832, 24 P.3d 404, cert. denied sub nom., Heckel v. Washington, 534 U.S. 997, 122 S.Ct. 467, 151 L.Ed.2d 383 (2001) (explaining that party challenging legislative act bears burden of proving it unconstitutional beyond a reasonable doubt).
[39] See, e.g., In re the Interest Mahaney, 146 Wash.2d 878, 893, 51 P.3d 776 (2002) (explaining that "[b]oth federal and Washington law are settled that court proceedings deciding matters of child custody should aim to protect the child's best interests.").
[40] Hansen, 24 Wash.App. at 38, 599 P.2d 1304 (requiring that the trial court determine the best interest of the child on remand).
[41] 530 U.S. 57, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000).
[42] 108 Wash.App. 602, 31 P.3d 1212 (2001) review granted, 145 Wash.2d 1033, 43 P.3d 21 (2002).
[43] Troxel, 530 U.S. at 68, 120 S.Ct. 2054.
[44] In re R.R.B., 108 Wash.App. at 621, 31 P.3d 1212.
[45] In re R.R.B., 108 Wash.App. at 606, 31 P.3d 1212.
[46] In re R.R.B., 108 Wash.App. at 616, 31 P.3d 1212.
[47] See Troxel, 530 U.S. at 73, 120 S.Ct. 2054.
[48] In re Marriage of Allen, 28 Wash.App. 637, 648, 626 P.2d 16 (1981).
[49] See RCW 26.09.002, .004, .184, .187, and.191; see also, 2 Washington Family Law Deskbook § 47.4(5), at 47-27 (2nd ed.2000).
[50] See RCW 26.09.184.
[51] Ex. 30 at 16.
[52] 2 VRP (Feb. 6.2002) at 43-33
[53] 2 VRP (Feb. 6.2002) at 44-45.
[54] Clerk's Papers at 540.
[55] Appellant's Reply Brief at 36.
[56] VRP (March 1, 2002) at 18.
[57] RCW 26.10.080.