128 P.3d 574 (2006)
Said Aba SHEIKH, Respondent/Cross-Appellant,
v.
Kevin S. CHOE and Kum S. Choe, d/b/a South Seattle Market, a sole proprietorship; Shell Oil Company, a foreign corporation; Height Point Mini Mart & Deli, a domestic nonprofit corporation; King County; Emma Daniels; Michael Gallow; Mychal Anderson; Pulefano Ativalu; and Miguel T. Pierre, Defendants, and
State of Washington, Appellant/Cross-Respondent.
No. 76723-8.
Supreme Court of Washington, En Banc.
Argued December 19, 2003.
Decided February 16, 2006.
*575 Jeffrey A.O. Freimund, Attorney General's Office, Torts Div, Olympia, for Petitioner/Appellant.
Darrell L. Cochran, John Robert Connelly, Gordon Thomas Honeywell et al, Tacoma, Fred Diamondstone, Jay Herman Krulewitch, Law Offices of Fred Diamondstone, Seattle, for Appellee/Respondent.
*576 Jayne Lyn Freeman, Seattle, for Amicus Curiae, Washington Defense Trial Lawyers.
Bryan Patrick Harnetiaux, Debra Leigh Williams Stephens, Spokane, for Amicus Curiae, Washington State Trial Lawyers Assoc. Foundation.
OWENS, J.
¶ 1 This case involves cross-appeals from a civil trial in which plaintiff Said Aba Sheikh obtained a judgment against the State of Washington for $10,364,372 in damages. Aba Sheikh's injuries were inflicted during an assault by four youths in March 1999. One of the four assailants, Mychal Anderson, had been placed in a dependency guardianship by the Department of Social and Health Services (DSHS). Another, Miguel Pierre, was a DSHS dependent who had been placed in foster care. Aba Sheikh brought claims against the State alleging (1) negligent placement of Anderson and Pierre by DSHS, (2) parental liability under an in loco parentis theory, (3) vicarious liability, and (4) negligent failure to provide treatment. While claims 2-4 were dismissed upon the State's motion for summary judgment, the jury rendered a verdict in favor of Aba Sheikh on his negligent placement claim. The State raises four issues on appeal: (1) whether DSHS owed a duty to Aba Sheikh, (2) whether there was sufficient evidence to support a proximate cause finding, (3) whether the trial court improperly denied the State's proposed Tegman[1] instruction, and (4) whether the trial court erred in failing to provide for periodic payments of Aba Sheikh's future economic damages under RCW 4.56.260. Aba Sheikh cross-appeals the dismissal of his second, third, and fourth claims. We reverse the trial court and hold that the State owed no duty to Aba Sheikh. We also affirm the trial court's dismissal of Aba Sheikh's additional claims.

FACTS
¶ 2 On March 27, 1999, Aba Sheikh was assaulted in the parking lot of a West Seattle minimart by Anderson, Pierre, Pulefano Ativalu, and Michael Gallow. Both Anderson and Pierre resided in the home of Emma Daniels as a result of placement arrangements by DSHS. Facts specific to DSHS's relationships with Anderson and Pierre are described separately below.

1. Anderson and DSHS
¶ 3 Anderson, 13 at the time of the assault, was a dependent child placed with Daniels in what is known as a dependency guardianship. A dependency guardianship is more permanent than foster care but less so than outright adoption. See RCW 13.34.136(1)(a), .145(1)(a). Among other features, the guardianship gave custody and control to Daniels until Anderson turned 18 and limited DSHS's supervisory role, terminating periodic judicial review of the dependency. Anderson's dependency guardianship could be altered only upon the court's finding that there was a substantial change in circumstances and the alteration would be in Anderson's best interests. RCW 13.34.233(2). In December 1998 and February 1999, Daniels asked that Anderson's dependency guardianship be terminated and that he be removed from her home due to his criminal behavior and general incorrigibility.

2. Pierre and DSHS
¶ 4 Pierre, 16 at the time of the assault, was a dependent placed in Daniels' home as a foster child. "Foster parents are responsible for the protection, care, supervision, and nurturing of the child in placement." RCW 74.13.330. However, unlike Anderson's dependency guardianship, Pierre's foster care placement involved greater ongoing involvement by DSHS. For example, DSHS was required to develop and monitor a plan for Pierre's foster home placement and produce reports for periodic review by the court. RCW 74.13.031(1), (5). A permanency planning hearing for Pierre was conducted by the juvenile court the day before the assault. Although there was significant evidence regarding Pierre's delinquent and criminal behavior, *577 DSHS recommended continued placement in Daniels' home and the court agreed. As with Anderson, Daniels requested that Pierre be removed from her home in the months before the assault.

3. Procedural History
¶ 5 The State argued, on motion for summary judgment under CR 56 and motion for judgment as a matter of law under CR 50, that it owed no actionable tort duty to Aba Sheikh. The trial court denied both motions, concluding that the State owed Aba Sheikh a common law duty to control Anderson and Pierre through DSHS's ability to seek changes in placement. After a verdict in Aba Sheikh's favor, the State timely appealed to Division One of the Court of Appeals. Aba Sheikh subsequently filed a cross-appeal, the issues of which were contingent upon the possibility the State would obtain a favorable decision on appeal. The Court of Appeals certified the case to this court for direct review.

4. State's Motion to Strike
¶ 6 RAP 10.3(a)(4) requires a "statement of the facts and procedure relevant to the issues presented for review, without argument" and that "[r]eference to the record must be included for each factual statement." Pursuant to these requirements, the State moves to strike dozens of sentences in Aba Sheikh's brief for failure to provide citation and use of improper argument. Upon review, the disputed statements are irrelevant to the legal issues addressed in this opinion. We therefore note only that, although in no way affecting the outcome of this case, the motion to strike is granted to the extent that Aba Sheikh's brief continues to fail to comply with RAP 10.3(a)(4) after taking into account the additional citation provided in his response to the motion to strike.

ISSUES
¶ 7 1. Did DSHS's influence or control over the placement of Anderson and Pierre create a duty to protect Aba Sheikh from intentional torts by those assailants?
¶ 8 2. Can Aba Sheikh maintain a claim against the State for in loco parentis liability?
¶ 9 3. Can Aba Sheikh maintain a claim against the State for vicarious liability?
¶ 10 4. Can Aba Sheikh maintain a claim against the State for negligent failure to provide treatment?

STANDARD OF REVIEW
¶ 11 At issue is the trial court's denial of the State's motion for summary judgment and judgment as a matter of law that it owed no duty to Aba Sheikh, as well as the trial court's decision to grant summary judgment in favor of the State as to Aba Sheikh's in loco parentis, vicarious liability and failure to provide treatment claims. "The standard of review of an order of summary judgment is de novo, and the appellate court performs the same inquiry as the trial court." Jones v. Allstate Ins. Co., 146 Wash.2d 291, 300, 45 P.3d 1068 (2002). The standard on a motion for judgment as a matter of law mirrors that of summary judgment. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000). The elements of negligence include the existence of a duty to the plaintiff, breach of that duty, and injury to the plaintiff proximately caused by the breach. Degel v. Majestic Mobile Manor, Inc., 129 Wash.2d 43, 48, 914 P.2d 728 (1996). Whether or not the duty element exists in the negligence context is a question of law that is reviewed de novo. Hertog v. City of Seattle, 138 Wash.2d 265, 275, 979 P.2d 400 (1999).

ANALYSIS

1. Placement Duty under Restatement (Second) of Torts § 319 (1965)
¶ 12 As a general rule, our common law imposes no duty to prevent a third person from causing physical injury to another. See RESTATEMENT (SECOND) OF TORTS § 315. Additionally, under the public duty doctrine, the State is not liable for its negligent conduct even where a duty does exist unless the duty was owed to the injured person and not merely the public in general. Taylor v. Stevens County, 111 Wash.2d 159, *578 163, 759 P.2d 447 (1988). However, this court recognizes an exception to both these general rules in Restatement (Second) of Torts, sections 315 and 319. See, e.g., Taggart v. State, 118 Wash.2d 195, 218-21, 822 P.2d 243 (1992). Under section 315(a), a duty arises where "a special relation exists between the actor and the third person which imposes a duty upon the actor to control the third person's conduct." Through Taggart and its progeny, we have adopted one class of these "special relation" cases as described in section 319: "`One who takes charge of a third person whom he knows or should know to be likely to cause bodily harm to others if not controlled is under a duty to exercise reasonable care to control the third person to prevent him from doing such harm.'" 118 Wash.2d at 219, 822 P.2d 243 (quoting RESTATEMENT (SECOND) OF TORTS § 319).
¶ 13 The Taggart court announced that "parole officers have a duty to protect others from reasonably foreseeable dangers engendered by parolees' dangerous propensities." Id. at 224, 822 P.2d 243. In reaching this conclusion, the court began to delineate the meaning of a "take charge" relationship, first stating that there must be a "`definite, established and continuing relationship between the defendant and the third party.'" Id. at 219, 822 P.2d 243 (quoting Honcoop v. State, 111 Wash.2d 182, 193, 759 P.2d 1188 (1988)). The Taggart court then cited RCW 72.04A.080, which states that parolees "`shall be subject to the supervision of the department of corrections, and the probation and parole officers of the department shall be charged with ... giv[ing] guidance and supervision to such parolees within the conditions of a parolee's release from custody.'" Id. (quoting RCW 72.04A.080). In addition, the State had the authority to (1) regulate the parolees' movements within the state, (2) require the parolees to report, (3) impose special conditions such as refraining from using alcohol or undergoing drug rehabilitation or psychiatric treatment, and (4) order the parolees not to possess firearms. Id. at 220, 822 P.2d 243. Finally, the court recognized that "parole officers are, or should be, aware of their parolees' criminal histories, and monitor, or should monitor, their parolees' progress." Id. The Taggart court concluded that "[b]ecause of these factors, ... parole officers have `taken charge' of the parolees they supervise for purposes of § 319." Id. (emphasis added). Thus, the "take charge" aspect of special relationship liability became a term of art incorporating the kinds of attributes described in Taggart.
¶ 14 Since Taggart, we have continued to define the class of cases in which a take charge duty exists. For example, in Hertog, this court held that a take charge special relationship extends to probation counselors and pretrial release counselors. 138 Wash.2d at 281, 292, 979 P.2d 400. The Hertog court noted that "[a] probation counselor is clearly in charge of monitoring the probationer to ensure that conditions of probation are being followed, and has a duty to report violations to the court." Id. at 279, 979 P.2d 400. The court applied similar reasoning to pretrial release counselors over the dissent's objection that such counselors "are not authorized to arrest the people on their caseload nor can they impose conditions of release." Id. at 296, 979 P.2d 400 (Alexander, J., concurring/dissenting). Pretrial counselors were, however, charged with reporting the violations of those they monitored to the court. Id. at 279, 979 P.2d 400. Additionally, in Bishop v. Miche, 137 Wash.2d 518, 524-31, 973 P.2d 465 (1999), the court held that a county probation officer had a take charge relationship with a probationer who killed a child while driving intoxicated. At the time of the incident, the county probation officer was monitoring Miche for alcohol use and Miche was under an order to obey the law for 24 months pursuant to a suspended sentence for driving while intoxicated. Id. at 522-23, 973 P.2d 465.
¶ 15 In contrast to the series of cases imposing a duty, at least two decisions from the Court of Appeals have defined limitations to the take charge exception. First and by far the most analogous to this case, Division One declined to impose a duty where DSHS had undertaken supervision of two children who later sexually assaulted a neighbor child. Terrell C. v. Dep't of Soc. & Health Servs., 120 Wash.App. 20, 29, 84 P.3d 899, review denied, 152 Wash.2d 1018, 101 P.3d 109 *579 (2004). DSHS was actively supervising the two children and had filed dependency petitions before the assault occurred, but the children had not been adjudicated dependent. Id. at 23-24, 84 P.3d 899. In concluding there was no take charge relationship, the court relied heavily on the nature of the child welfare statutes, stating as follows:
The statutory scheme does not contemplate that social workers will supervise the general day-to-day activities of a child. Rather the social worker's role is to coordinate and integrate services in accord with the child's best interests and the need[s] of the family. Any "ongoing" relationship between the social worker and the child is to prevent future harm to that child, not to protect members of the community from harm.

Id. at 28, 84 P.3d 899 (emphasis added) (footnote omitted). Thus, the court gave great weight to the distinction between DSHS's statutory purpose (protecting children) and the criminal justice system's purpose in the Taggart line of cases (to "properly supervise an adjudicated offender based on the prior crime"). Id. Additionally, in Couch v. Department of Corrections, 113 Wash.App. 556, 54 P.3d 197 (2002), review denied, 149 Wash.2d 1012, 69 P.3d 874 (2003), Division Two held that no take charge relationship exists where Department of Corrections' (DOC) supervision of an offender is limited to the collection of legal financial obligations (LFO). The court held that DOC's authority, limited to requiring offenders to report and answer questions about financial matters, is insufficient to create a duty to prevent future crimes. Id. at 569, 54 P.3d 197.
¶ 16 We are tasked with determining where the State's relationships to Anderson and Pierre fall on the continuum of take charge cases discussed above. In appealing the trial court's decision to extend the take charge duty into the realm of DSHS placement decisions, the State relies on the statutory limits of DSHS's purpose and authority, existing case law, and public policy considerations. In response, Aba Sheikh argues that there is some statutory basis for imposing a duty and Terrell C. is immaterial because the assailants in that case were not dependents.
¶ 17 There are numerous statutory descriptions of the purposes underlying DSHS's child welfare division. For example, RCW 26.44.010 declares that "[i]t is the intent of the legislature that ... protective services shall be made available in an effort ... to safeguard the general welfare of [abused] children." Similarly, RCW 74.15.010(1) states that the purpose of the care of children chapter of the code is "[t]o safeguard the health, safety, and well-being of children ... receiving care away from their own homes, which is paramount over the right of any person to provide care." With direct reference to the sentiment expressed in these statutes, this court has recently stated that "[the] statement of purpose encompasses two concerns: the integrity of the family and the safety of children within the family." M.W. v. Dep't of Soc. & Health Servs., 149 Wash.2d 589, 597-98, 70 P.3d 954 (2003) (citing Tyner v. Dep't of Soc. & Health Servs., 141 Wash.2d 68, 80, 1 P.3d 1148 (2000)). Out of this declaration we find a fundamental distinction between the criminal justice agencies at issue in Taggart, Hertog, and Bishop, which supervise and impose conditions on criminals because they are criminals in order to protect the public, and DSHS's child welfare system, which exists to protect abused children from harm.
¶ 18 In response, Aba Sheikh relies on several statutory references to DSHS's control over placement and takes them out of context to argue that there is statutory support for a take charge relationship. For example, Aba Sheikh lists DSHS's authority to (1) ensure appropriate placements with foster parents, (2) remove a child from a foster home, (3) monitor and supervise a foster home, (4) arrange case worker contact every 90 days, (5) license foster homes, and (6) deny, suspend, revoke, or refuse to renew foster home licenses. See former WAC 388-73-212(6), (7) (1999), repealed by St. Reg. XX-XX-XXX (Sept. 28, 2001); RCW 74.13.260; RCW 74.15.010(5), .030(3), (5). While DSHS clearly has some control over dependent children, *580 these statutes uniformly follow from child welfare's stated purpose: to safeguard the health and welfare of dependent children. Aba Sheikh also directs us to RCW 74.15.010(5), which states that DSHS is directed to "license agencies ... and to assure the users of such agencies, their parents, the community at large and the agencies themselves that adequate minimum standards are maintained by all agencies caring for children." (Emphasis added.) Aba Sheikh reasons that the authority to license agencies (e.g., foster homes, group homes) and assure the "community at large," among others, that those agencies are meeting minimum standards in their care of dependent children suggests that DSHS's placement authority is intended to protect the public from the tortious acts of those dependent children. This argument is not well taken. Nothing in this statement of purpose suggests DSHS is directed to protect the public from dependent children. The statement does, however, speak to providing the public with assurances that DSHS is fulfilling its child protection role. Again, this represents a clear distinction from the criminal justice system.
¶ 19 We find further support for the State's position in the reasoning provided by Terrell C. and, to a lesser degree, Couch. While Aba Sheikh is correct that there is distinction to be found in the fact that the Terrell C. assailants had not yet been adjudicated dependents, that fact was not an essential aspect of the court's analysis. The mere existence of some ability to control a third party is not the dispositive factor in determining whether a take charge duty exists; rather, the purpose and extent of such control defines the relationship for purposes of tort liability.[2]See Taggart, 118 Wash.2d at 220, 822 P.2d 243. The Terrell C. court correctly concluded that while DSHS had some ability to seek a court order to remove the children from the home, the purpose of such removal would have been to protect those children, not the public at large and not the children's neighbor who became the victim of the assault. Similarly, in Couch, DOC had the ability to require offenders to report, question them about their financial status, and report them to the court if they were delinquent on LFO payments. Despite DOC's authority to "control" offenders subject to LFO supervision, the Couch court came to the logical conclusion that such control does not create a duty to protect the public from future crimes because of the limits on the relationship.
¶ 20 Finally, public policy considerations weigh strongly in favor of concluding that DSHS owes no duty to protect the public from the criminal acts of dependent children. First, imposing such a common law duty on DSHS would directly conflict with separate DSHS statutory mandates. On the one hand, DSHS is required to ensure that foster care placements are in the least restrictive, most family-like setting available. See 42 U.S.C. § 675(5)(A); RCW 74.13.065(2)(f). On the other hand, DSHS would be subject to liability or at least the potential for liability if it did not take significant steps to restrict the freedom of dependent children, the vast majority of whom have suffered severe abuse or neglect, when those children exhibit dangerous or violent behavior. Second, DSHS does not have the statutory authority to put dependent children in "lock down" placements. It is undisputed that the most restrictive placement would be group home facilities, which cannot physically restrict a resident's movement in the same manner as a juvenile detention facility.
¶ 21 In sum, the nature of DSHS's statutory relationship to dependent children, the existing case law, and public policy considerations all support a conclusion that the State owed no duty to Aba Sheikh. DSHS's authority is limited to moving dependent children between foster homes or group homes that are in "[t]he least-restrictive, most family-like placement reasonably available." RCW 74.13.065(2)(f). The purpose of this authority is to protect "the integrity of the family and the safety of children within the family." M.W., 149 Wash.2d at 597, 70 P.3d 954. All of this lies in stark contrast to the authority of criminal justice agencies to supervise *581 offenders or alleged offenders for the purpose of protecting the public from harm as in Taggart, Hertog, and Bishop. Accordingly, we hold that DSHS owed no duty to Aba Sheikh under Restatement (Second) of Torts, section 319.

2. In Loco Parentis Liability
¶ 22 Aba Sheikh argues that it was error for the trial court to dismiss, upon motion for summary judgment, his in loco parentis claim against DSHS. The in loco parentis relationship is a common law doctrine that is not well defined in our case law. In State ex rel. Gilroy v. Superior Court, 37 Wash.2d 926, 933, 226 P.2d 882 (1951), this court gave some meaning to the doctrine through citation to outside authority, stating as follows:
"One who takes a child into his home and treats it as a member of his own family, educating and supporting it as if it were his own child, is said to stand to the child in loco parentis ....
"Where one stands in loco parentis to another, the rights and liabilities arising out of that relation are, as the words imply, substantially the same as between parent and child."
(quoting 39 AM. JUR. 697 § 61). Aba Sheikh reasons that Anderson's and Pierre's status as dependents, requiring DSHS to provide basic services (housing, physical care and medical care), and DSHS's authority to assume custody under RCW 74.13.031(6), create the in loco parentis relationship.[3]
¶ 23 In the foster care setting it is the foster parent, Daniels in this case, who stands in the parental role, not DSHS. RCW 74.13.330 defines the responsibilities of foster parents as follows: "Foster parents are responsible for the protection, care, supervision, and nurturing of the child in placement." Congruently, RCW 74.15.020(1)(g) defines "[f]oster-family home" as "an agency which regularly provides care on a twenty-four hour basis to one or more children." In contrast to Daniels, DSHS was limited to coordinating the foster care services and, in the case of Pierre, monitoring the home on an ongoing basis. It was Daniels who took the children into her home and treated them as members of her own family, educating and supporting them. See Gilroy, 37 Wash.2d at 934, 226 P.2d 882. DSHS had no analogous relationship. Therefore, the trial court was correct when it concluded as a matter of law that DSHS did not stand in loco parentis as to Anderson and Daniels.

3. Vicarious Liability
¶ 24 Aba Sheikh next argues that it was error for the trial court to dismiss his vicarious liability claim against DSHS. Because Daniels was a foster parent, Aba Sheikh reasons, she established an agency relationship with DSHS and thereby established the availability of a vicarious liability claim. In response, the State contends that foster parents are independent contractors of DSHS for whom the State cannot be vicariously liable. Two cases touch on this issue. In DeWater v. State, 130 Wash.2d 128, 140-41, 921 P.2d 1059 (1996), the court held that foster parents are independent contractors for purposes of deciding an employment discrimination claim. The DeWater court undertook a careful analysis of DSHS's relationship with foster parents, in particular DSHS's degree of control, and concluded as follows:
The State sets forth certain standards for licensing a foster home and requires general compliance with certain standards, but it does not control the manner and means of operating the home. The foster parent is paid per child, rather than for time worked; and the State treats foster parents as vendors, not employees, for tax purposes.

*582 . . . .
[T]here is no employee/employer relationship primarily because there is no right to control the daily actions of the foster parent and thus no ability to supervise or interfere with the day-to-day interaction between a foster parent and those working in the foster home. The State could revoke a foster parent's license and remove foster children from the home, but it would have no right to otherwise "control" the actions of the foster parent. A foster parent is therefore not a state employee.
Id. at 139-40, 921 P.2d 1059. In contrast, in Estate of Jones v. State, 107 Wash.App. 510, 521, 15 P.3d 180 (2000), the Court of Appeals stated that a DSHS-run group home for juvenile offenders was vicariously liable for torts that occurred when a resident escaped. Notably, the full extent of the court's analysis on this issue is as follows: "Second Chance was an agent of the State when it operated the group home to which the State assigned Dodge and the State remains liable for any negligent supervision by Second Chance via respondeat superior." Id.
¶ 25 Despite the detailed description of DSHS's inability to control foster parents in DeWater, Aba Sheikh suggests that DeWater is distinguishable because the purported liability arose out of employee hiring and supervision decisions by foster parents rather than the supervision of foster children. Instead, Aba Sheikh would have us rely on the sparse analysis in Estate of Jones and hold that DSHS does have "control" over the day-to-day operations of foster parents as they relate to care decisions. Estate of Jones is distinguishable primarily because the group home was operating as a criminal justice facility. Dodge, the child who escaped and committed the crimes that became the basis for the estate's tort claims, was placed in the group home by the court as a sentence for a previous burglary and was under supervision by both a probation counselor and a juvenile rehabilitation administration officer. Id. at 514-15, 15 P.3d 180. We find the reasoning in DeWater much more complete, analogous, and, therefore, persuasive. Thus, we reaffirm the DeWater holding and find that foster parents are independent contractors whose actions do not impose vicarious liability on the State.

4. Negligent Failure to Provide Treatment
¶ 26 Aba Sheikh's third and final alternative claim is that DSHS had a duty, established by administrative regulation, to protect the public by providing mental health and substance abuse treatment to Anderson and Pierre. We employ a three-part test to determine whether a statute or regulation creates an implied cause of action: (1) "whether the plaintiff is within the class for whose `especial' benefit the statute was enacted," (2) "whether legislative intent, explicitly or implicitly, supports creating or denying a remedy," and (3) "whether implying a remedy is consistent with the underlying purpose of the legislation." Bennett v. Hardy, 113 Wash.2d 912, 920-21, 784 P.2d 1258 (1990). Aba Sheikh's argument regarding this issue is extremely underdeveloped, failing to even discuss the Bennett test. Instead, Aba Sheikh simply cites three now-repealed sections of the WAC that detail DSHS's responsibility to provide psychological, mental health, and chemical dependency services to dependent children.[4]
¶ 27 The basis for Aba Sheikh's claim fails to satisfy any of the three Bennett factors. First, these administrative rules are clearly intended to benefit the recipients of the listed services. Aba Sheikh points to nothing in the WAC or authorizing legislation that would suggest the treatment provisions are intended to prevent tortious acts by dependent children from harming the community *583 at large. Second, Aba Sheikh's only contention that the legislature intended to create a remedy is his renewed citation to the "community at large" reference in RCW 74.15.010(5) (one of DSHS's purposes is to license foster homes to ensure there are minimum standards in child care). Licensing foster homes has no relation to offering additional services (i.e., mental health and chemical dependency treatment) to dependent children.[5] Finally, as discussed in detail in above, the purpose of the child welfare statutes and regulations is to benefit the dependent children, not to make DSHS a component of the criminal justice system. Because Aba Sheikh fails to succeed under any part of the Bennett test, we hold that the trial court was correct in granting summary judgment in the State's favor on the negligent failure to provide treatment claim.

CONCLUSION
¶ 28 We hold that the State owes no duty under Restatement (Second) of Torts, section 319 to persons harmed by the tortious acts of dependent children. Imposing such a common law duty on the State would be inconsistent with the principles of "take charge" liability and our current case law, as well as contrary to important public policy concerns. We also hold that the trial court did not err in granting the State's motion for summary judgment as to Aba Sheikh's in loco parentis, vicarious liability and negligent failure to provide treatment claims. As Aba Sheikh maintains no remaining claims, the judgment against the State is vacated and all other issues on appeal are moot.
ALEXANDER, C.J., C. JOHNSON, MADSEN, BRIDGE, FAIRHURST, and J.M. JOHNSON, JJ., concur.
CHAMBERS, J. (concurring).
¶ 29 I concur with the majority.
Like both the majority and dissent, I would not extend the duty we found in Taggart v. State, 118 Wash.2d 195, 217, 822 P.2d 243 (1992), based upon the State's "take charge" relationship with those on parole or probation, to foster children. Those convicted of crimes and those committed to the State's care as foster children are far too different to permit that analogy. Foster children are under the State's supervision overwhelmingly through no fault of their own. The primary duty of the State is the protection of these children. Terrell C. v. Dep't of Soc. & Health Servs., 120 Wash.App. 20, 28-29, 84 P.3d 899, review denied, 152 Wash.2d 1018, 101 P.3d 109 (2004). Foster children are entitled to the least restrictive placement possible. Imposing a duty in negligence to third parties injured by foster children is inconsistent with placing these children in the most family-like setting possible, and it would have a potentially terrible, negative impact on these children.
¶ 30 But that is not to say the State should be immune from any enforceable duty of care. The State, of course, may be liable for its own negligence. The public's right to be free from the violent acts of foster children may be found in other common law duties such as negligent entrustment that results in foreseeable injuries. Cf. Hickle v. Whitney Farms, Inc., 148 Wash.2d 911, 925-26, 64 P.3d 1244 (2003); cf. State ex rel. Gilroy v. Superior Court, 37 Wash.2d 926, 933, 226 P.2d 882 (1951) (quoting 39 AM. JUR. § 61, at 697 and 67 C.J.S. § 71, at 803). However, I concur with the majority that, in this case, none of these theories presented by the plaintiff survives summary judgment.
¶ 31 I write separately because this case offers us an opportunity to examine the practical impact of Tegman v. Accident & Medical Investigations, Inc., 150 Wash.2d 102, 75 P.3d 497 (2003).[1] As often happens, Aba *584 Sheikh pleaded a case involving both negligent and intentional acts that resulted in indivisible harm. Aba Sheikh was assaulted by four youths in March 1999. Their conduct was intentional. Aba Sheikh also alleged that the negligence of the Department of Social and Health Services was partially to blame. Judge William L. Downing properly, in my view, read Tegman to permit, but not require, segregation of harm.
¶ 32 Tegman, of course, must be read in harmony with our case law interpreting apportionment, especially Cox v. Spangler, 141 Wash.2d 431, 439-40, 5 P.3d 1265 (2000) and Phennah v. Whalen, 28 Wash.App. 19, 28-29, 621 P.2d 1304 (1980), as Judge Downing properly did here. The Cox court applied the long-recognized common law rule that an at-fault defendant bears the burden of proof that seemingly indivisible damages are in fact segregable. Cox, 141 Wash.2d at 443-44, 446-47, 5 P.3d 1265 (quoting RESTATEMENT (SECOND) OF TORTS § 433B (1965) and Phennah, 28 Wash.App. at 28-29, 621 P.2d 1304).
¶ 33 The principles in play are well illustrated in Phennah. There, the plaintiff was injured in two unrelated car accidents that happened about four months apart. Phennah, 28 Wash.App. at 20, 621 P.2d 1304. The plaintiff saw the same physician after each accident. Id. That physician testified that both accidents contributed to a permanent disability and that it was "impossible" to determine which accident caused what portion of the harm. Id. at 21, 621 P.2d 1304. The plaintiff sued both drivers, but did not attempt to segregate the damage between them. The defendants successfully filed a motion to dismiss based on the plaintiff's failure to attempt to segregate, and the Court of Appeals reversed and remanded for trial.
¶ 34 Key to the court's holding was the fact that the divisibility of the harm was only theoretical: the harm was actually indivisible. Phennah, 28 Wash.App. at 23-24, 621 P.2d 1304. Like Judge Downing below, the Phennah court found that the burden of segregating the harm caused, if possible, properly rested with the defendants. Phennah, 28 Wash.App. at 29, 621 P.2d 1304. Accordingly,
"[w]here the tortious conduct of two or more actors has combined to bring about harm to the plaintiff, and one or more of the actors seeks to limit his liability on the ground that the harm is capable of apportionment among them, the burden of proof as to the apportionment is upon each such actor."
Phennah, 28 Wash.App. at 28, 621 P.2d 1304 (quoting RESTATEMENT (SECOND) OF TORTS § 433(B)(2) (1965)).
¶ 35 Similarly, in Cox, the injury to the plaintiff might have been caused by two parties in succession, but the first (who caused an accident months before) was not potentially "at-fault" for purposes of RCW 4.22.070 because of statutory immunity from liability under the Industrial Insurance Act, Title 51.04 RCW. This precluded joint and several liability. We concluded the trial court correctly instructed the jury that the burden of establishing the injury was segregable, and that the burden of apportioning the harm fell upon the lone remaining (at-fault) defendant. Cox, 141 Wash.2d at 447-48, 5 P.3d 1265. The defendant would be responsible for the entire injury if it could not meet that burden.
¶ 36 The State argues these cases are inapplicable because they do not involve an intentional tortfeasor. The argument misses the point. Cox involved one at-fault defendant under RCW 4.22.070 and a party relieved from liability under the Industrial Insurance Act. See Cox, 141 Wash.2d at 446, 5 P.3d 1265. That is substantially similar, analytically, to the case before us.
¶ 37 Here the State may be an at-fault defendant under RCW 4.22.015 and the four *585 assailants are excluded from that statute because they are intentional tortfeasors. RCW 4.22.015 ("`Fault' includes acts or omissions... that are in any measure negligent or reckless."). On this important point Cox, Phennah, and Sheikh are analogous. In an unanimous opinion by Justice Alexander, this court held that an at-fault defendant bears the burden to prove seemingly indivisible damages are in fact segregable, and if this burden is not met, the defendant remains liable for those damages. Cox, 141 Wash.2d at 448, 5 P.3d 1265; see also Phennah, 28 Wash.App. at 28-29, 621 P.2d 1304; RESTATEMENT (SECOND) OF TORTS § 433(B)(2). This result was not based upon the principle of joint and several liability, which, in any event, did not apply in Cox because an immune entity was the other alleged cause of the damages. See Cox, 141 Wash.2d at 446, 5 P.3d 1265. Rather, again, the court grounded its decision in the actual indivisibility of the plaintiff's injuries. See Cox, 141 Wash.2d at 447, 5 P.3d 1265; accord Phennah, 28 Wash.App. at 23-24, 621 P.2d 1304.
¶ 38 In this case, the trial judge properly harmonized the tort reform act, chapter 4.22 RCW, Tegman, Cox, and Phennah.
¶ 39 I concur with the majority.
SANDERS, J. (dissenting).
¶ 40 The majority holds the Department of Social and Health Services (DSHS) has no duty to ensure that foster parents are competent to control the children entrusted to them. I disagree.
¶ 41 Forty years of precedent  and plain common sense  confirm that the State assumes a parent's duty to control children in its custody. See Evangelical United Brethren Church v. State, 67 Wash.2d 246, 259-60, 407 P.2d 440 (1965). This duty to control foster children is a "special relation" creating tort liability under the public duty doctrine. See RESTATEMENT (SECOND) OF TORTS § 316 (1965). And see Taggart v. State, 118 Wash.2d 195, 218-21, 822 P.2d 243 (1992). DSHS can and does delegate this duty to foster parents. But it retains a duty to place foster children with foster parents capable of controlling them. Cf. Peck v. Siau, 65 Wash. App. 285, 288, 827 P.2d 1108 (1992) (discussing state liability for negligent hiring and retention).

I. BACKGROUND
¶ 42 On March 27, 1999, a gang of four young thugs  Miguel Pierre, Mychal Anderson, Pulefano Ativalu, and Michael Gallow  viciously beat 14-year-old Said Aba Sheikh. They dragged Sheikh from a parked car, pummeled him with fists and feet, repeatedly stomped on his head, and left him for dead in the parking lot of a Shell gas station. Sheikh survived the assault. But he suffered severe brain damage and permanent disability.
¶ 43 The ringleaders of the gang  Pierre and Anderson  were dependent children in State custody. Both lived with Emma Daniels, a single, elderly foster mother who worked full-time. See Ex. 7-542. And both were gang members with long histories of serious crime and violence, including assault, sexual abuse, burglary, car theft, and drug dealing. See Report of Proceedings (RP) at 95-100; Exs. 7-542 and 575. DSHS concealed those criminal histories from Daniels. See RP at 148-50, 173-74. It knew Daniels was incapable of controlling the children in her care.[1] And when she confessed her inability to control Pierre and Anderson, repeatedly begging DSHS to place them with another foster parent, see, e.g., RP at 59-64, 72, 147-48, 176; exs. 8-601, 7-561, it ignored *586 her requests and even threatened to hold her responsible "if something happened to the boys due to lack of supervision." Ex. 8-575.

II. LIABILITY EXISTS UNDER THE PUBLIC DUTY DOCTRINE BECAUSE THE STATE STANDS IN LOCO PARENTIS TO FOSTER CHILDREN
¶ 44 The majority concludes that the State is not liable to Sheikh for negligently placing Pierre and Anderson with a foster parent incapable of controlling them because it has no "special relation" to foster children. Under the public duty doctrine, the State is liable for negligence only when it owes a duty specific to the injured person because "`a duty to all is a duty to no one.'" Babcock v. Mason County Fire Dist. No. 6, 144 Wash.2d 774, 785, 30 P.3d 1261 (2001) (quoting Taylor v. Stevens County, 111 Wash.2d 159, 163, 759 P.2d 447 (1988)). But the State owes a duty specific to an injured person when it has a "special relation" to a third person who injures that person.
¶ 45 After lengthy analysis, the majority concludes no "special relation" exists because children are not parolees. See majority at 577-78 (discussing Taggart, 118 Wash.2d 195, 822 P.2d 243). While many teens might take exception, the majority is quite correct, as far as it goes.

A. The State Stands In Loco Parentis to Foster Children in Its Custody
¶ 46 But the State does not limit its "special relations" to parolees. It is well-settled that the State stands in loco parentis or "in the place of a parent" to minor children in its custody. "[T]he standard of care imposed upon the state in its treatment, management, and control of delinquent children committed to its custody may be likened to that of parent to child." Evangelical United Brethren Church, 67 Wash.2d at 259-60, 407 P.2d 440. See also Eldredge v. Kamp Kachess Youth Servs., Inc., 90 Wash.2d 402, 408, 583 P.2d 626 (1978) ("As the court's agent, the standard of care imposed upon Kamp is that of a parent."). And see, e.g., Camp v. Gregory, 67 F.3d 1286, 1297 (7th Cir.1995); P.G. v. Dep't of Health & Human Servs., Div. of Family & Youth Servs., 4 P.3d 326, 332 (Alaska 2000); E.P. v. Riley, 604 N.W.2d 7, 12 (S.D.1999); Calabria v. State, 289 N.Y. 613, 43 N.E.2d 836 (1942).
¶ 47 Curiously, the majority characterizes the in loco parentis relationship as "not well defined in our case law." Majority at 581. In fact, there is little to define. A party stands in loco parentis by "acting as a temporary guardian or caretaker of a child, taking on all or some of the responsibilities of a parent." BLACK'S LAW DICTIONARY 803 (8th ed.2004). See State v. Waleczek, 90 Wash.2d 746, 752-53, 585 P.2d 797 (1978) (following State ex rel. Gilroy v. Superior Court, 37 Wash.2d 926, 933, 226 P.2d 882 (1951)). The relationship thereby established is "undefined" only in that the duties accompanying it depend on the circumstances.

B. The Duty of a Parent to Control a Child is a "Special Relation" under the Public Duty Doctrine
¶ 48 And a parent's duty to control the conduct of a child is a canonical "special relation" establishing liability for negligent failure to control the actions of a third party.
A parent is under a duty to exercise reasonable care so to control his minor child as to prevent it from intentionally harming others or from so conducting itself as to create an unreasonable risk of bodily harm to them, if the parent: (a) knows or has reason to know that he has the ability to control his child, and (b) knows or should know of the necessity and opportunity for exercising such control.
RESTATEMENT (SECOND) OF TORTS § 316 (1965). See Norton v. Payne, 154 Wash. 241, 248, 281 P. 991 (1929) (holding parent "responsible for the negligence of the parent in causing the child to become dangerous and not attempting to restrain it"); Sun Mountain Prods., Inc. v. Pierre, 84 Wash.App. 608, 615-16, 929 P.2d 494 (1997) (adopting objective standard of care for negligent supervision); Barrett v. Pacheco, 62 Wash.App. 717, 724, 815 P.2d 834 (1991); Carey v. Reeve, 56 Wash.App. 18, 22, 781 P.2d 904 (1989). Cf. RCW 4.24.190 (holding parents statutorily liable for up to $5,000 for their child's "willful[] and malicious[]" torts, *587 in addition to any common law liability); Cornelius J. Peck, Parental Liability for Wilful and Malicious Acts of Children, 36 WASH. L. REV. & ST. B.J. 327, 331 (1961) (emphasizing that RCW 4.24.190 "does not limit the amount of recovery against the parents for their own common law negligence"). The public duty doctrine merely asks "whether the State had a duty to the plaintiff." Taggart, 118 Wash.2d at 218, 822 P.2d 243. Because the State explicitly assumes a duty, the public duty doctrine cannot absolve it of liability.
¶ 49 In any case, any party standing in loco parentis has a duty to control its ward. The State no more assumes "[g]eneral responsibility for the rearing of incorrigible children" than does a parent. Fowler V. Harper & Posey M. Kime, The Duty to Control the Conduct of Another, 43 YALE L.J. 886, 895 (1934). But it must "exercise the care which a reasonable parent should exercise to prevent his child from creating an unreasonable risk of harm to third persons." Id. See, e.g., Evangelical United Brethren Church, 67 Wash.2d at 259-60, 407 P.2d 440; Riley, 604 N.W.2d at 12 (holding that "public duty doctrine is inapplicable" to the State's duty to control foster children); P.G., 4 P.3d at 331 (holding State "stands in a special relationship ... with children in need of aid who come under its supervision). Thus, the State is "liable for the tortious conduct of a child" in its custody "if [it] know[s] of the child's dangerous proclivity and fail[s] to take reasonable measures to control that proclivity." Carey, 56 Wash.App. at 26, 781 P.2d 904 (citing Eldredge, 90 Wash.2d at 408, 583 P.2d 626). See also Riley, 604 N.W.2d at 15 n. 6 (holding that the State "owed a duty to exercise reasonable care to control" a child in its custody). In fact, the State's relation to foster children is arguably more intimate and comprehensive even than its relation to parolees. If the State has a duty to control parolees merely because it exerts limited authority over them, it certainly has a duty to control children actually in its custody.

III. THE STATE HAS A DUTY TO PLACE CHILDREN WITH ABLE FOSTER PARENTS
¶ 50 The majority characterizes foster parents as "independent contractors whose actions do not impose vicarious liability on the State." Majority at 582. Fair enough. When the State places a child in its custody with a foster parent, the foster parent  not the State  occupies the in loco parentis relationship. See RCW 74.13.330. Cf. RCW 4.24.590 ("In actions for personal injury or property damage commenced by foster children or their parents against foster parents..., the liability of foster parents for the care and supervision of foster children shall be the same as the liability of biological and adoptive parents for the care and supervision of their children."). Because the State lacks sufficient control over the foster parent-foster child relationship, it is not vicariously liable for a foster parent's negligence. See, e.g., Hennig v. Crosby Group, Inc., 116 Wash.2d 131, 802 P.2d 790 (1991). But it does have a duty to inform foster parents when a foster child is dangerous, see Taggart, 118 Wash.2d at 221, 822 P.2d 243 (citing Johnson v. State, 69 Cal.2d 782, 786, 447 P.2d 352, 73 Cal.Rptr. 240 (1968)), and "an ongoing duty to control" children after releasing them from its custody to their parents. See Taggart, 118 Wash.2d at 221, 822 P.2d 243 (citing Doe v. Arguelles, 716 P.2d 279 (Utah 1985)).
¶ 51 And it also has a duty to place children in its custody with an able foster parent. "Commensurate with the parental obligation to supervise a child's activities outside the home is a duty on the part of the state not to place one of its charges with an adult that it knows will not or cannot exercise that responsibility." Camp, 67 F.3d at 1296 (finding State assumes "affirmative duty to intervene" when foster parent incompetent (id. at 1295)). See also Estate of Jones v. State, 107 Wash.App. 510, 521, 15 P.3d 180 (2000) (recognizing State's duty of careful placement). Like any general contractor, the State is directly liable for negligently supervising the work of an independent contractor. See RESTATEMENT (SECOND) OF TORTS § 343 (1965); Tauscher v. Puget Sound Power & Light Co., 96 Wash.2d 274, 281, 635 P.2d 426 (1981) ("An owner who employs an independent contractor is already *588 liable to all third persons ... for negligence in the hiring of the independent contractor."). See also Kimberly Lionel King, Case Note, 12 FLA. ST. U.L. REV. 935, 941 (1985) ("The negligent supervision theory is also based upon direct liability."). Thus, it is directly liable for negligently placing Pierre and Anderson with Daniels because it knew she was unable to control them.
¶ 52 This duty of careful placement is fully consistent with state law. DSHS must place foster children in the least restrictive, most family-like setting in the child's community, consistent with the child's best interests. See 42 U.S.C. § 675(5)(A); RCW 74.13.065(2)(e), (f); RCW 13.34.136(1)(b)(iii). Obviously, a degree of supervision calculated to discourage criminal behavior is consistent with a child's best interests.
¶ 53 Oddly, the majority relies on precedents holding that the State has no duty to exercise authority it does not possess. Yes, the State has no duty to control children not in its custody. See Terrell C. v. Dep't of Soc. & Health Servs., 120 Wash.App. 20, 84 P.3d 899 (2004). And it has no duty to control parolees it lacks effective authority to monitor. Couch v. Dep't of Corr., 113 Wash.App. 556, 54 P.3d 197 (2002). Likewise, it has no duty of careful placement when it lacks authority to change a foster child's placement. Stenger v. State, 104 Wash.App. 393, 404, 16 P.3d 655 (2001). Unsurprisingly, "in cases where there is no underlying statutory authority to control or take charge of the offender's behavior, no special relationship has been imposed." Terrell C., 120 Wash.App. at 28, 84 P.3d 899.
¶ 54 But the State did have the authority to place Pierre and Anderson with a different foster parent. As the majority itself recognizes, while the State cannot control the daily actions of the foster parent, majority at 581, it can remove foster children from the home and place them in an alternative setting as necessary, majority at 580. See also RCW 74.13.290-.300. The State knew Pierre and Anderson were dangerous. And it knew Daniels could not control them. It had the authority to place Pierre and Anderson with an able foster parent and a duty to do so. It chose not to exercise its authority and thereby breached its duty of careful placement.
¶ 55 Accordingly, I dissent.
NOTES
[1] Tegman v. Accident & Med. Investigations, Inc., 150 Wash.2d 102, 75 P.3d 497 (2003). The proposed jury instruction by the State relates to the segregation of damages between negligent and intentional tortfeasors.
[2] For example, in Taggart the parole officer was tasked with regulating the parolees' movement and monitoring their use of drugs and alcohol, the failure of both of which led to the parolees' attacks on the victims. 118 Wash.2d at 200-03, 822 P.2d 243.
[3] The dissent refers us to Evangelical United Brethren Church v. State, 67 Wash.2d 246, 259-60, 407 P.2d 440 (1965) (analogizing the treatment, management, and care of delinquent children committed to its custody to a parent/child relationship). This case is inapposite because it involved a child placed in a juvenile corrections facility, not dependency, and the statutory basis for the State's responsibility has since been repealed. Washington courts have recognized that the Evangelical United decision is "outdated" and has been "significantly narrowed by later decisions." Estate of Jones v. State, 107 Wash. App. 510, 522-23, 15 P.3d 180 (2000) (citing Taggart, 118 Wash.2d at 214-15, 822 P.2d 243).
[4] Former WAC XXX-XX-XXXX(2) (1999), repealed by St. Reg. XX-XX-XXX (Feb. 7, 2000), states that, beyond the basic requirements of foster family home care, clothing, and personal incidentals, "[a]dditional requirements for the eligible child shall be school supplies when not provided by the school, needed transportation costs, and psychological services." Former WAC 388-86-067(1) (1999), repealed by St. Reg. XX-XX-XXX (Mar. 12, 2000), states that the "department shall provide mental health or day health care services." Finally, former WAC 388-86-300(1) (1999), repealed by St. Reg. XX-XX-XXX (Sept. 29, 2000), states that the "department shall provide chemical dependency outpatient treatment services to a Medicaid client," which includes dependent children.
[5] See also Braam v. State, 150 Wash.2d 689, 712, 81 P.3d 851 (2003) (under RCW 74.14A.050 (requiring DSHS to develop programs for dependent's emotional, medical, and mental needs), there was "no evidence of legislative intent to create a private cause of action, and that implying one is inconsistent with the broad power vested in DSHS to administer these statutes").
[1] I will make no secret of the fact that I would reverse Tegman. I have already set forth my view of why Tegman is wrong. See Tegman, 150 Wash.2d at 120-35, 75 P.3d 497 (Chambers, J., dissenting). Tegman is also harmful because it prevents full and fair compensation to victims that the legislature clearly intended to fully compensate. RCW 4.22.070(1)(b). It creates the perverse possibility of a grossly negligent party escaping any liability because of the completely foreseeable intentional conduct of another. An examination of the tortured verdict form in this case should be sufficient to satisfy anyone that Tegman's requirement that indivisible damages be segregated twice, based upon irreconcilable standards, has a harmful impact on the law. Under Tegman, damages must be segregated first based upon cause, and second based upon the character of the defendants' conduct. The results of these different standards may have nothing to do with one another and will confound any jury.
[1] The Youth Development Director of the YMCA (Young Men's Christian Association) informed DSHS that Daniels's home "has not been a healthy placement for Miguel [Pierre]" who was "free to come and go as he pleases and does not get the support necessary to receive the services he needs." Ex. 7-535. One DSHS social worker reported that Daniels "diligently tried to work with [Pierre] to no avail." Ex. 10-930. Another reported that "Without intensive and creative interventions, [Pierre] is in danger of becoming involved in the adult criminal system." Ex. 10-934. Another reported that "the adolescent boys in [Daniels's] home have taken a downward spiral in their behavior and have been involved in criminal behaviors." Ex. 7-542. And a foster home licensor reported that "All of the youth" in Daniels's custody "are involved in car theft and assaultive behaviors." Ex. 7-575.